UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | CRIMINAL NO: |
| v. | ) | 03-10234-MLW |
| | ) | |
| JOSHUA GOLDSMITH | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

GOVERNMENT'S OPPOSITION TO
DEFENDANT JOSHUA GOLDSMITH'S MOTION TO SUPPRESS EVIDENCE

The United States, by and through its attorney, Michael J.
Sullivan, United States Attorney for the District of
Massachusetts, opposes the motion of the defendant, Joshua
Goldsmith, to suppress evidence, and submits this memorandum in
support of its opposition.

## I.  INTRODUCTION

On or about May 4, 2004, a three-count Second Superseding
Indictment was returned against defendants, John Gillies
("Gillies"), Ben Silver ("Silver") and Joshua Goldsmith
("Goldsmith"), charging them in Count One with conspiracy to
possess with intent to distribute marijuana in violation of 21
U.S.C. §§ 841(b)(1)(B)(vii) and 846, and in Counts Two and Three,
with possession with intent to distribute marijuana, in violation
of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D) and aiding and abetting
the same, in violation of 18 U.S.C. § 2.  Counts One and Three
further allege that the offense involved more than 100 kilograms

of a mixture and substance containing a detectable amount of marijuana, thereby invoking a minimum mandatory sentence of five years, pursuant to 21 U.S.C. § 841(b)(1)(B)(vii), and Count Two alleges that the offense involved more than 50 kilograms of a mixture and substance containing a detectable amount of marijuana, thereby invoking a twenty year maximum sentence, pursuant to 21 U.S.C. § 841(b)(1)(C).

## II.  RELEVANT FACTS

The facts leading up to the Indictment are as follows.  On or about May 16, 2003, Task Force Officer J. Martin Ferrell ("TFO Ferrell") of the DEA -Interdiction Unit in Greensboro, North Carolina, received information from the Old Dominion Shipping Company that its Port Lomo, California, facility had received a suspicious package for delivery to Dracut, Massachusetts.

At the time, TFO Ferrell was advised that the shipper of the crate had paid for delivery by cash.  Old Dominion also sent him by facsimile a copy of the Bill of Lading and a xerox copy of the driver's license of the person who dropped off the package - defendant Goldsmith.  See, copy of the Affidavit of Johnny Martin Ferrell ¶ 3, filed herewith (hereinafter "Ferrell Affidavit ¶ "). The Bill of Lading was handwritten and listed the shipper as the Underwater Equipment Sales, 317 Catalina Ct., Point Loma, CA 92107.  It identified two telephone numbers associated with the shipper - 619-980-0807 and 800-329-3324.  It also appeared to TFO

Ferrell that the crate was addressed to DVP Diving Studio, 33 Silva Lane, Dracut, MA 01826 with a telephone number of 781-244-2154. Ferrell Affidavit ¶ 4. The Bill of Lading described the freight as a wooden crate containing "test equipment." Id. Finally, "will call" was indicated, meaning that someone would be picking it up at Old Dominion's loading dock, rather than having Old Dominion deliver it to its ultimate destination.

Upon receiving that information, TFO Ferrell performed a records check on Goldsmith, and learned that Goldsmith had a previous marijuana trafficking arrest on April 11, 1992 from Chicago, IL. TFO Ferrell also learned that Goldsmith had possessed 19.5 pounds of marijuana at the time. Ferrell Affidavit, ¶ 4. TFO Ferrell then conducted a criminal history check on Goldsmith and learned that Goldsmith had been convicted on August 16, 1991 of this charge, and that he was also arrested in California on January 25, 2001, for possessing marijuana for sale and conspiracy. The last arrest showed no disposition. Id.

In addition to learning about Goldsmith's past marijuana dealings, TFO Ferrell also learned that one of the phone numbers listed on the Bill of Lading had a prior drug connection. Ferrell Affidavit ¶ 5. Specifically, TFO Ferrell learned that one of the numbers was associated with a Michael Joseph Doyle, who had appeared on a DEA database as being suspected of distributing kilogram quantities of cocaine, and distributing

crystal methamphetamine, ecstasy, ketamine, rohyphnol, xanax and marijuana.  Ferrell Affidavit ¶ 5.

Based upon this information, TFO Ferrell contacted security at Old Dominion, and requested that Old Dominion reroute the package to Greensboro, North Carolina, the location of both TFO Ferrell's office and another Old Dominion hub.  Ferrell Affidavit ¶ 6.  When he did so, TFO Ferrell learned that the package was already en route.  Id.  He also knew that because the package was destined to Massachusetts, the package would first travel to Old Dominion's hub in Morristown, TN, prior to being shipped to its ultimate destination.  Id.

After requesting that the package be rerouted to Greensboro, TFO Ferrell learned additional information about the shipper and the consignee.  He learned that there was no business in the Point Loma, CA, area with the name of the shipper, Underwater Equipment Sales.  He learned that the shipper's address, 317 Catalina Ct., Point Loma, CA, was fake.  Ferrell Affidavit ¶ 7.  Likewise, he learned that there was no business in the Dracut, MA, area with the name of the recipient, DVP Diving Studio, or any similar name.  Id.  He also learned that the address listed for DVP Diving Studios was actually the address for the Old Dominion depot in Dracut, MA.  Id.

Based upon this information, and upon his training and experience, on May 21, 2003,  TFO Ferrell obtained a search

4

warrant for the crate.[1]  Ferrell Affidavit ¶ 9.  On that day, the
crate had arrived at Old Dominion's facility in Greensboro, NC.
TFO Ferrell immediately executed the warrant and discovered the
crate contained four locked containers, each of which contained
marijuana.  Id.

TFO Ferrell seized the marijuana and immediately advised DEA
in Boston, MA, about his discovery.  Ferrell Affidavit ¶ 10.  The
next day, May 22, 2003, TFO Ferrell transferred the marijuana to
the DEA Flight wing in Greensboro, NC, which then flew the
marijuana to DEA-Boston, MA.  Ferrell Affidavit ¶ 10.

DEA-Boston took custody of the marijuana on May 22, 2003,
and arrangements were made for a controlled delivery.  On May 27,
2003, defendant Gillies attempted to pick up the marijuana from
the Old Dominion facility in Dracut, MA, but was unable to do so
because the crate could not fit into his truck.  The next day,
Gillies tried again, took custody of the crate, and drove it to a
private storage facility.  At that time, he was met by Silver and
another individual, John Ryan.  Gillies and Silver were then
arrested.

---

[1]A copy of the warrant is attached as Exhibit 4 to
Goldsmith's Motion to Suppress.

## III. ARGUMENT

A.  <u>The Defendant Does Not Have A Reasonable Expectation Of Privacy In the Crate</u>

At the outset, Goldsmith cannot claim the protection of the Fourth Amendment in the crate because he cannot carry the burden of proving he had a legitimate expectation of privacy in the seized packages.  "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted," <u>Alderman v. United States</u>, 394 U.S. 165, 174 (1969), and the defendant bears the burden of demonstrating that he had a legitimate expectation of privacy in the contents of the package as a threshold requirement to having a cognizable Fourth Amendment claim.  <u>See</u> <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 104 (1980).

Although the Supreme Court stated in <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978), that this inquiry falls under substantive Fourth Amendment doctrine, courts use the term "standing" as shorthand for the existence of a legitimate privacy interest sufficient to assert a Fourth Amendment claim.  <u>See, e.g.</u> <u>United States v. Richards</u>, 638 F.2d 765, 769 (5th Cir.), <u>cert. denied</u>, 454 U.S. 1097 (1981).  The qualifier "legitimate" evinces more than the mere bona fides of the defendant's expectation of privacy.  The defendant's subjective expectation must also be "legitimate," in that society must be prepared to recognize it as reasonable.  <u>See</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 143 n.12 (1979).  These two inquiries are distinct and the defendant bears the burden and

6

must prevail on both.  See United States v. Paulino, 850 F.2d 93, 96-97 (2d Cir. 1988), cert. denied, 490 U.S. 1052 (1989)(defendant may have a bona fide subjective expectation of privacy, but still have no legitimate expectation of privacy interest where society does not willingly accept it as reasonable). The First Circuit has offered the following list of generic factors which may be pertinent to that inquiry:

> ownership, possession, and/or control;  historical use of the property searched or the things seized;  ability to regulate access;  the totality of the surrounding circumstances;  the existence or nonexistence of a subjective anticipation of privacy;  and the objective reasonableness of such an expectancy under the facts of a given case.

United States v. Aguirre, 839 F.2d 854, 856-57 (1st Cir. 1988).

While sealed letters and packages are clearly entitled to Fourth Amendment protection, see United States v. Jacobsen, 466 U.S. 109, 114 (1984), the defendant does not have a cognizable Fourth Amendment interest where he is neither the sender nor the addressee of a package.  In cases comparable to the instant case, courts have refused to find a legitimate expectation of privacy in the contents of a package where, as here, the defendant claiming a privacy interest is neither the sender nor the addressee, especially where fictitious information is used to disguise the ownership of the package.  United States v. Pitts, 322 F.3d 449, 456-457 (7th cir. 2003)(no 4th Amendment protection where sender abandoned package because package label listed the

sender under an assumed name and sender did not have proper
identification under assumed name); United States v. Smith, 39
F.3d 1143, 1144-45 (11th Cir. 1994)(no expectation of privacy
where letter was addressed to another and only equivocal evidence
of defendant's ownership of contents); United States v. Daniel,
982 F.2d 146, 148 (5th Cir. 1993)(intended recipient of package
had no 4th Amendment protection where package addressed to a
fictitious person); United States v. Pierce, 959 F.2d 1297 (5th
Cir. 1992)(no expectation of privacy where defendant was neither
sender nor the addressee of the package); United States v.
Koenig, 856 F.2d 843 (7th Cir. 1988)(defendant who was neither
sender nor addressee had no privacy interest where no other
source of privacy interest in package was asserted); United
States v. Givens, 733 F.2d 339, 342 (4th Cir. 1984)(no
expectation of privacy where package addressed to another
individual); United States v. Zavala, 2003 WL 431636, *1 (E.D. PA
2003) (even if defendants had subjective interest in package,
their failure to disclose true identities on package vitiated a
4th Amendment expectation of privacy).

   Although Goldsmith was the person who brought the package to
Old Dominion for shipping, the package itself was shipped under
an assumed name and address.  The Bill of Lading showed the
sender was "Underwater Equipment Sales," with an address at 317
Catalina Court, Pt. Loma, CA, 92107.  Underwater Equipment Sales

is a fictitious name.   317 Catalina Court is a fictitious

address.   The same is true for the intended recipient of the

crate.   The Bill of Lading states that the crate was to "DVP

Diving & Video" at 33 Silva Lane, Dracut, MA.   There is no entity

with the name "DVP Diving Studios" or any similar name in the

Dracut, MA area.   Investigation showed that the 33 Silva Lane,

Dracut, MA, is actually the address for Old Dominion Freight

Company.   In circumstances such as this, there is simply no

*legitimate* expectation of privacy.   United States v. DiMaggio,

744 F.Supp. 43, 46 (N.D.N.Y. 1990) (expectation of privacy in

package vanished when defendants listed false identities as

sender and recipient).  "Society would not be prepared to

recognize such an expectation of privacy as reasonable where the

individual has not legitimately manifested to society –- in some

appropriate manner given the context – that he is entitled to

such privacy."); but see United States v. Wood, 6 F.Supp. 2d

1213, 1223-24 (D. Kansas 1998)(where package addressed to

fictitious name that is the alter ego of defendant, and defendant

is the immediate recipient, defendant has standing); United

States v. Allen, 741 F.Supp. 15 (D. Maine 1990)(where defendant

paid addressee $50 to use address and to deliver unopened package

to defendant upon receipt, defendant retained legitimate

expectation of privacy).

     As Goldsmith has not established a legitimate expectation of

privacy in the contents of the UPS packages, his Motion To

Suppress Evidence should be denied without a hearing.

B.    <u>The Seizure Of The Crate Was Lawful Because Law Enforcement
      Had A Reasonable Suspicion to Detain</u>

Assuming, *arguendo*, that Goldsmith has a reasonable

expectation of privacy in the crate, his motion to suppress must

nevertheless be denied because law enforcement had a reasonable

suspicion to detain.[2]

In order to support a seizure, law enforcement officials

must possess a reasonable suspicion based on articulated facts

that a package contains contraband before they may detain the

package for investigation.  <u>See</u> <u>United States v Van Leeuwen</u>, 397

U.S 249, 252-53 (1970).  <u>See also</u> <u>United States v. Place</u>, 462

U.S. 696, 700-06 (1983) (reasonable suspicion can justify brief

detention of property); <u>United States v. West</u>, 731 F.2d 90, 91-92

(1st Cir. 1984) (similar), <u>cert. denied</u>, 469 U.S. 1188 (1985).

In the instant case, the following characteristics were

applicable to the crate and are consistent with the drug-package

profile.  First, the bill of lading was handwritten and, at least

on the facsimile copy, was not particularly legible.  In

particular, when TFO Ferrell reviewed the facsimile copy, it

appeared to him that the recipient was "DVP Diving Studio," not

---

[2]It is questionable whether the package was even "detained"
by law enforcement personnel prior to the warrant being issued,
given the fact that Goldsmith had no possessory interest in the
crate at the time the crate was directed to Greensboro, NC.

"DVP Diving & Video," as it actually appears on the bill of lading. This poorly written bill of lading is inconsistent with Goldsmith's assertion that the package could have been from a legitimate small business, as even the most basic sole proprietor has ready access to word processing equipment. Second, TFO Ferrell was advised that payment for the shipment was made in cash, and was designated for "will call" pickup and shipped via commercial mail receiving agency ("CMRA"). Id. According to the Eighth Circuit in United States v. Logan, 362 F.3d 530, 531 (8th Cir. 2004), "traffickers frequently ship packages via CMRAs to conceal the sender's identity, and prefer to use handwritten labels that can be filled out moments before the package is deposited with the CMRA to further lessen the chances of detection." Id. Third, records checks on Goldsmith's name revealed a prior conviction in Chicago, Illinois, for possession with intent to distribute marijuana, as well as an arrest in California in 2001 for possessing marijuana and for sale and conspiracy to commit a crime. Id. Fourth, records checks within DEA database revealed that at least one of the telephone numbers listed on the bill of lading was associated with a Michael Joseph Doyle ("Doyle"), and that Doyle was suspected in distributing kilogram quantities of cocaine, and distributing crystal methamphetamine, ecstacy, ketamine, rohyphnol. xanax, and marijuana. Id.

It was based upon these facts that TFO Ferrell requested
that the Old Dominion Freight Lines to reroute the package to
Greensboro, NC.  It is important to note, however, that TFO
Ferrell was advised that even with this slight diversion from
Tennessee to North Carolina, there would be no delay in delivery
if he were ultimately to determine that a search of the crate was
not warranted.

In the Supreme Court's <u>Van Leeuwen</u> decision, a postal clerk
was suspicious of a package and notified a policeman.  The
policeman noticed that the return address on the package was a
vacant housing area and that the license plate of the person who
mailed the package was from British Columbia.  He also learned
the addressees of the package were under investigation for
trafficking illegal coins.  On these facts, the Supreme Court
upheld a finding of reasonable articulable suspicion which
justified detention of the packages.  <u>Van Leeuwen</u>, 397 U.S. at
252-253.  In <u>United States v. LaFrance</u>, 879 F.2d 1 (1st Cir.
1989), the First Circuit likewise considered a similar case.  In
<u>LaFrance</u> the Lewiston, Maine police received anonymous tips that
the defendant was selling cocaine and marijuana received via
Federal Express.  They then investigated and found out that the
defendant had sent and received weekly FedEx packages to and from
Florida over the past few months, and based upon that information
the First Circuit upheld a finding of reasonable articulable

12

suspicion.  <u>LaFrance</u>, 879 F.2d at 4-5.

Additionally in <u>United States v. Allen</u>, 990 F.2d 667 (1st
Cir. 1993), the defendant had received three Express Mail
packages in five months and the postal inspector investigating
knew that the defendant had received suspicious mailings in the
past from the West Coast, and noted the suspicious nature of
mailing label and the fact individuals rarely receive Express
Mail packages.  Based upon these facts and the fact that the
postal inspector had seven years of experience investigating drug
transportation through the mail, and had investigated between 200
and 300 cases involving transport through Express Mail,
reasonable suspicion was found and the detention of the package
was justified   <u>Id</u>. at 671.  Of additional relevance numerous
other circuits have commented on articulable reasonable suspicion
in similar circumstances.  <u>See</u>, <u>e.g.</u>, <u>United States v. Martin</u>,
157 F.3d 46, 53 (2d Cir. 1998) (reasonable suspicion to detain
UPS package because it contained 8 airplane parts whose serial
numbers were listed as stolen on nationwide stolen parts locator
system); <u>United States v. Daniel</u>, 982 F.2d at 150 (5th Cir. 1993)
(per curiam) (reasonable suspicion to detain package because it
matched size and shape of "drug package profile"; package was
securely taped, labels were handwritten, it was second mailing
within a week, it was shipped via private air courier, and sender
was from a drug-source city); <u>United States v. Ward</u> 144 F.3d

13

1024, 1029 (7th Cir. 1998) (reasonable suspicion for DEA agent
with 22 years' experience to seize unattended bag on bus because
bag came from high-crime area and agent knew this was a common
way to transport drugs); United States v. Nurse, 916 F.2d 20, 24
(D.C. Cir. 1990) (reasonable suspicion to detain bag because
passenger traveled from drug-source city late at night, paid cash
for train ticket, carried unreliable identification, gave vague
answers about destination and host, and attempted to leave with
bag and conceal destination when officer said would detain bag);
United States v Demoss, 279 F.3d 632, 636 (8th Cir. 2002)
(reasonable suspicion to detain package because it was sent
overnight, paid for with cash, no telephone numbers listed for
sender or recipient, and package taped excessively and smelled of
perfume)

        Thus, in the instant case where TFO Ferrell was aware of the
suspicious nature of the bill of lading, the cash payment, the
will call status of the package, the criminal history of
Goldsmith, the drug connections to one of the phones associated
with the sender, reasonable suspicion existed to justify a brief
detention of this package, in order for TFO Ferrell investigate
further and obtain a search warrant.

C.    The *De Minimis* Intrusion of the Detention Justify the
      Seizure

        Given the fact that seizures of property can vary in
intrusiveness, some brief detentions of personal effects, such as

14

packages, may be so minimally intrusive of Fourth Amendment
interests that strong countervailing governmental interests will
justify a seizure, especially when based on specific articulable
facts that property contains contraband or evidence of a crime.
Thus, given the observation in United States v. Mendenhall, 446
U.S. 544 (1980), that the public has a compelling interest in
detecting those who would traffic in deadly drugs for personal
profit, it is clear that the principles of Terry and its progeny
would permit agents to detain the package briefly and in a
limited manner, as was done in the instant case.

As to the specific meaning of a reasonable, limited
detention, the Supreme Court has declined to adopt any outside
time limitation or circumstance.  The instant case however,
compares favorably to First Circuit precedent.  In LaFrance the
First Circuit takes note that the vast majority of case law
dealing with property detention involves luggage.  LaFrance, 879
F.2d at 5.  The court notes however, that "the case at bar is cut
from a different cloth than the luggage detention cases."  Id.
The court in LaFrance noted that while a speedy, set delivery
schedule influences one's possessory interests in property, the
analogy to luggage detention is inapt, because luggage detention
implicates not only an individual's possessory interest, but also
his "liberty interest in proceeding with his itinerary."  Id.
Thus, as the court notes, in the ordinary commercial package

case, there is no liberty interest accompanying the possessory interest, the police are subject to fewer restraining circumstances. <u>Id</u>. at 6.

This is particularly true in the instant case, since, unlike the Federal Express recipient in <u>LaFrance</u>, the recipient here did not have a contractual expectation that the package would be delivered at a set time. Indeed, because it was a "will call" delivery, the recipient of the package would receive a call when the package arrived, and would be instructed to come to the dock and pick it up. Thus, here the recipient would not have been waiting for the package, encumbered by its late arrival. He instead would have been free to go about his ordinary business. Therefore, as the First Circuit in both <u>LaFrance</u> and <u>Allen</u> ruled, this court should apply a less exacting scrutiny to the reasonableness of package detentions vis a vis luggage detentions, or, for that matter, Federal Express deliveries.

It is true that the police are not free to dispossess an individual at will. In parcel detention, reasonableness remains the focus of judicial inquiry. <u>Id</u>. The court in <u>LaFrance</u> goes on to make an explicit holding that time of detention is not necessarily synonymous with, or even a reliable proxy for, intrusiveness of detention, and that consequently the duration of a detention, while an important consideration, is not the sole yardstick with which the suitability of police procedures must be

measured.  Id.  According to LaFrance and affirmed by Allen,
there are three presumptively relevant factors in determining the
reasonableness of the detention: 1) investigatory diligence, 2)
length of detention, and 3) information conveyed to the suspect.
Allen, 990 F.2d at 671 (citing LaFrance, 879 F.2d at 7).

As to diligence the court in LaFrance stated "diligence, we
think, is fairly characterized by steady, earnest, energetic and
attentive application and effort toward a predetermined end."
LaFrance, 879 F.2d at 8.  Based upon that definition it is clear
that TFO Ferrell was diligent in the instant case.  At the time
he made his request to Old Dominion to reroute the package, the
package was already on its way to Morristown, TN, Old Dominion's
east coast hub.  During the following days (including the
weekend), TFO Ferrell learned additional information suggesting
that the crate was part of a narcotics scheme.  He made inquiries
about the sender and about the intended recipient of the crate.
He learned from the California authorities that no such business
as "Underwater Equipment Sales" existed in the Point Loma area.
He also learned that the address the so-called business used was
completely fake.  TFO Ferrell also made inquiry about "DVP Diving
Studio," the intended recipient, and learned that this business
was likewise fake, and that it did not list a legitimate address.
Rather, it used the address of Old Dominion.

With respect to the reasonableness of the length of the

detention, the government contends that there essentially was no detention at all, or, if so, it was extremely limited.  TFO Ferrell first received information regarding the suspicious nature of this package on Friday, May 16, 2003.  When he made his determination later that day that the package should be rerouted, the package was already in transit.  According to Old Dominion records, the crate arrived in Morristown, TN, on May 20, 2003.[3] The next day, instead of being driven to Dracut, MA, it was delivered to Greensboro, NC.  By that time, TFO Ferrell had investigated enough such that he had applied for, and obtained, a search warrant, and promptly discovered the marijuana after the search.  The crate with the marijuana was then taken into DEA custody, and promptly flown to the Boston, MA area on May 22, 2003.

Thus, arguably, the only period of time in which the crate was "seized" without a warrant was the short time period between May 20, 2003, through May 21, 2003, when the crate was loaded onto a truck headed for Greensboro, rather than for Dracut, MA. However, during this period of time, Goldsmith did not have a possessory interest in the crate.  Goldsmith suggests that he should have had the package in five days, but, significantly, does not assert that he had a contractual right to have the

---

[3]The crate was headed to Morristown, TN, whether or not TFO Ferrell had requested it be rerouted.

package delivered within five days.  Further, the five day period
does not include weekends or the day of pick-up/delivery.  Thus,
in this case, the five days would have expired on May 22, 2003
(after the date the marijuana was seized pursuant to the
warrant).  When the crate was driven from Morristown, TN, to
Greensboro, NC, rather than being directed to Dracut, MA,
Goldsmith did not have a possessory interest in the crate.  Thus,
there was not a detention between this time and the time when TFO
Ferrell discovered the marijuana pursuant to the search warrant.

     Even if the court were to find that Goldsmith had a
contractual interest with Old Dominion with respect to a delivery
date, it is clear that until the originally expected delivery
date had passed, that any contractual interest was substantially
unscathed.  It is only upon the package's failure to be delivered
on time, that there is any substantial intrusion upon that
possessory interest.  United States v. LaFrance, 879 F.2d at 9.

     The third factor to determine the reasonableness of the
detention - the information communicated to the suspect -  is
inapplicable here.  According to the First Circuit in LaFrance,
the underlying rationale of Place suggests that "if accurate,
information about where luggage has been taken, for how long, and
how it may be returned, is important largely because it affects a
liberty interest (i.e. the possessor's ability to travel);
misinformation can obviously cause delay, disruption of routing

19

and timing, or general inconvenience." <u>See</u> <u>Id.</u> (citing <u>Place</u>,
462 U.S. at 708; <u>West</u>, 731 F.2d at 94).  Where the intrusion
implicates only a possessory interest, as in parcel detention
cases, however, that interest is usually unaffected by the place
at which the seized article is kept and what one is told, so long
as the object's condition is undisturbed. <u>Id</u>.  Only information
about how long the detention may last is relevant, because only
such information relates to the length of dispossession. <u>Id</u>.
Here, no information was communicated to the recipient, no
possessory interests were displaced and no unlawful seizure
occurred.

D.   <u>The Search Warrant In This Case Was Supported By Probable</u>
     <u>Cause</u>

     The First Circuit, in the case <u>United States v. Riberio</u>, 397
F.3d 43, 48 (1st Cir. 2005), recently reiterated the probable
cause requirements for a search warrant:  "A warrant application
must demonstrate probable cause to believe that (1) a crime has
been committed--the 'commission' element, and (2) enumerated
evidence of the offense will be found at the place to be
searched--the so-called 'nexus' element."  "In determining
whether the nexus element is satisfied, a magistrate has to make
"a practical, common-sense decision whether, given all the
circumstances set forth in the affidavit before him, ... there is
a fair probability that contraband or evidence of a crime will be
found in a particular place. . . . Put differently, the

application must give someone of "reasonable caution" reason to believe that evidence of a crime will be found at the place to be searched." Id. at 49 (citations omitted).

The facts which gave TFO Ferrell reasonable suspicion to request that the crate be rerouted, when coupled with the facts he learned after he requested the crate be rerouted, support a finding of probable cause. As described previously, the bill of lading was handwritten and not particularly legible; the shipment was paid for in cash; pick up was arranged via "will call", and the shipment was with a commercial mail receiving agency. In addition, the person dropping off the package, Goldsmith, had a past criminal history in marijuana trafficking and one of the phone numbers on the bill of lading likewise was linked to drug trafficking. Finally, and significantly, it was apparent by the time TFO Ferrell applied for the warrant, that the shipper and the recipient of the crate chose to remain anonymous, as both the shipper's name and the recipient's name were fake, as was the shipper's address. The recipient, on the other hand, chose to use a real address, but just not an address that would reveal its identity. It chose to use the address of Old Dominion itself.

Based upon these facts, and TFO Ferrell's training and experience as a narcotics investigator for the past thirteen years, including his involvement with over 500 cases involving the sale and delivery of illegal controlled substances, the

21

search warrant set forth sufficient facts to establish probable
cause to believe that an illegal controlled substance would be
contained with the package sent by the defendant.

Accordingly, there was probable cause for a search warrant
to issue and this court should uphold its use and application.

E.    Assuming, *Arguendo*, The Search Warrant Was Not Supported By
      Probable Cause, The Law Enforcement Officer Acted In Good
      Faith, And, Therefore, The Good Faith Exception To
      Suppression Applies

Even if the Court were to find that the warrant authorizing
the search of the crate was issued without sufficient probable
cause, the evidence seized pursuant to the warrant is
nevertheless admissible pursuant to holding in United States v.
Leon, 468 U.S. 897 (1984).

In Leon, the Supreme Court adopted an exception to the
exclusionary rule, which requires that evidence seized in
violation of the Fourth Amendment be excluded from trial.  468
U.S. at 905-926.  In doing so, the Court recognized that the
purpose of the exclusionary rule is to deter misconduct, and thus
declined to apply the rule where an officer acts in good faith to
obtain a warrant, because suppression in such cases does not
"logically contribute to the deterrence of Fourth Amendment
violations."  United States v. Capozzi, 347 F.3d 327, 332 (1st
Cir. 2003).

The Leon Court preserved the remedy of suppression in four
situations:  1) where the issuing magistrate judge was misled by

information in an affidavit that the affiant knew was false or would have known was false except for reckless disregard of the truth; 2) where the issuing magistrate judge wholly abandoned his detached and neutral judicial role; 3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and 4) where a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. Leon, 468 U.S. at 923.

None of these situations exist in this case and the defendant does not suggest otherwise. As described above, the affidavit here set forth sufficient probable cause, such that TFO Ferrell's reliance on the search warrant was objectively reasonable. See Leon, 468 U.S. at 919 n.20; see also Illinois v. Gates, 462 U.S. 213, 235 (1983)("only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.")(citation omitted). Moreover, even if the affidavit did not establish probable cause, it clearly was not "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Leon, 468 U.S. at 923, quoting Brown v. Illinois, 422 U.S. 590, 610-611 (1975) (Powell, J., concurring in part). Suppression is not an appropriate remedy where the warrant, even if defective, is based upon "evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause."

Leon, 468 U.S. at 926.

Accordingly, even if the court were to find that the warrant lacking in probable cause in this case, the court should not likewise find that the evidence should be suppressed due to the good faith exception articulated in Leon.

### IV.  CONCLUSION

Based upon the foregoing, the court should deny the defendant's motion to suppress.

<div style="margin-left:40%">

MICHAEL J. SULLIVAN
United States Attorney


By:   /s/ Susan M. Poswistilo
      SUSAN M. POSWISTILO
      Assistant U.S. Attorney

</div>