UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
          V.             )     CRIMINAL NO. 03-10234-MLW
                         )
JOHN GILLIES (1) and     )
JOSHUA GOLDSMITH (3)     )

GOVERNMENT'S OPPOSITION TO DEFENDANT JOHN GILLIES'
MOTION TO SUPPRESS EVIDENCE

_____The government hereby opposes the motion of defendant John

Gillies ("Gillies") to suppress the marijuana discovered upon the

execution of a state court search warrant in Greensboro, NC, on May

21, 2003.  The government also incorporates herein its opposition

memorandum filed May 27, 2005 in connection with the suppression

motion of co-defendant Joshua Goldsmith ("Goldsmith"), and submits

this memorandum in further opposition to Goldsmith's motion.

Accordingly, the government will not repeat herein the prior

memorandum's factual statement and the legal discussion sections

about "standing," detention of the shipping crate, probable cause

in support of the search warrant, and the applicability of the Leon

good faith exception to the exclusionary rule.  This memorandum

will deal primarily with the standing of Gillies to contest the

search of the shipping crate, and the Rule 41 issue raised for the

first time in Gillies' suppression motion.  Additionally, it will

also address the attenuation and independent source doctrines,

which are applicable to the motions of both defendants.  Where new

authorities or arguments are presented on the issues addressed in

the government's earlier memorandum, it will be so noted.

### 1.  Standing

Although the government contests, for reasons discussed in it earlier opposition to Goldsmith's suppression motion, that either defendant can establish his burden of demonstrating a legitimate expectation of privacy in the shipping crate, Gillies' claim of standing is far weaker than that of Goldsmith.  Although Goldsmith used a fictitious name and address as the sender of the crate and a fictitious name and an inaccurate address for the recipient of the crate, he used his own genuine identification information as the person responsible for shipping the crate.  Thus, Goldsmith, used his true identity, associated himself with the shipping crate, and eliminated his anonymity.  Gillies did no such thing; he relied on the fictitious recipient on the bill of lading, paid delivery due charges in cash, and presented false and fraudulent identification when he picked-up the shipping crate.[1]

Gillies claims in his affidavit that he expected the contents

---

[1]The government is prepared to show that when Gillies appeared at the Old Dominion facility in Dracut to take possession of the shipping crate he provided a fraudulent New York State driver's license in the name of Robert Burgess.  Although the license was in the name of Robert Burgess, the person depicted on the photographic driver's license was Gillies.  The government is also prepared to show that the storage unit to which Gillies was taking the marijuana after picking it up in Dracut was rented by him in a second false identity (David Martino), supported by a fraudulent driver's license that included his photograph.

of the shipping crate to remain private.[2]  But a "legitimate" expectation of privacy requires more than the bona fides of a defendant's expectation of privacy.  A defendant's subjective expectation of privacy is not enough; it must be legitimate in that society must be prepared to recognize it as reasonable.  See Rakas v. Illinois, 439 U.S. 128, 143 n. 12 (1979).  Gillies is essentially asking for a licence to use an interstate shipping company for criminal purposes.  Despite having tried to protect his own anonymity from the shipping company and criminal investigators, he now wants this Court to accept his privacy interest in the shipping crate as "legitimate."  His claimed privacy interest now is in stark contrast to his efforts during the transit of the crate, continuing even as he picked-up the shipment with fraudulent identification, to disguise his association with the shipment and to distance himself from the marijuana.

A false shipper's name and address was used; a false recipient's address was used; and Gillies used fraudulent identification and cash to obtain possession of the marijuana. Until he took actual possession of the shipping crate, he had no

_____

[2]Gillies also admitted ownership of the marijuana, having supplied the money to buy the drugs in the shipping crate.  "While ownership of the drugs is undoubtedly one fact to be considered in this case, Rakas emphatically rejected the notion that 'arcane' concepts of property law ought to control the ability to claim the protections of the Fourth Amendment."  Rawlings v. Kentucky, 448 U.S. 98, 105 (1980) (citing Rakas v. Illinois, 439 U.S. 128, 149-150, n. 17 (1978)).

known or knowable association with the shipment.[3]  Except for the execution of the search warrant and the controlled delivery of the marijuana, only his co-conspirators would have know of his involvement in this criminal activity.  His intentional and consistent distancing of himself from the shipping crate in order to avoid criminal responsibility should not now be rewarded with a right to contest a search and seizure that occurred while he was doing everything possible to avoid any association with the shipping crate and its unlawful contents.  Given the observation in United States v. Mendenhall, 446 U.S. 544 (1980), that the public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit, coupled with Gillies attempts to distance himself from the shipping crate until he took possession of it on May 28, 2003, this Court should find that society is not prepared to recognize as reasonable and legitimate Gillies' subjective expectation of privacy in the shipping crate.

---

[3]It is important to note that when the shipping crate was diverted to Greensboro, NC, and when the state court search warrant was executed, Gillies' ownership of the marijuana and interest in the shipping crate was fully protected from discovery by law enforcement.  Investigators had no information at that time connecting him with the shipping crate or the marijuana.  It was only when Gillies arrived at Old Dominion in Dracut that he associated himself with the shipment, and then only after he picked it up and had it in his possession, as the fraudulent New York State driver's license that he used on May 27th when he first tried to take possession of the shipping crate could not be traced to him.

**2.    Probable Cause**

The government supplements its earlier discussion of probable cause with the following.

The affidavit in support of the search warrant application in this case informed the issuing state court judge that the affiant, Johnny Martin Ferrell, had thirteen years experience as a narcotics investigator, and involvement in over 500 cases involving the sale and delivery of illegal controlled substances.  The affidavit also specifically stated:

> Based upon applicant's training and experience the applicant contends the characteristics mentioned above, cash payment, fictitious business and address for shipper, dock drop off and dock to dock shipping, fictitious business for intended receiver, criminal history of the subject who shipped the freight (Joshua Goldsmith) and the association with telephone numbers to another individual suspected of illegal narcotics trafficking (Michael Joseph Doyle) provides probable cause to believe marijuana, Cocaine, Methamphetamine, Heroin, Hashish and/or other illegal controlled substances will be contained inside the wooden crate bearing Pro #00801725235.

Accordingly, the words of the First Circuit in United States v. Soule, 908 F.2d 1032, 1040 (1st Cir. 1990), are equally applicable here:

> Finally, the affidavit was prepared by a police officer whose experience and expertise provided the clerk magistrate with further reason to credit the representation in the warrant application that marijuana would be found at 255 Broadway.  See, e.g., United States v. Ortiz, 422 U.S. 891, 897 (1975); Grimaldi v. United States, 606 F.2d 332, 337 (1st Cir. 1979); United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir. 1987) ("magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a

crime is likely to be found"). Moreover, to an experience police officer possessed of the other information recited in the Hayes affidavit, the facially innocent act of driving the pick-up truck around to the back door of the barn, at the rear of the residence, rather than to the front door of the barn, would take on telling significance as to the type of cargo about to be unloaded.

The First Circuit's words in <u>United States v. Taylor</u>, 985 F.2d 3 (1st Cir. 1993), are also equally applicable here, where one part of the probable cause showing was the information learned by the affiant about Joshua Goldsmith's drug-related criminal history: "An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination." <u>Taylor</u>, 985 F.3d at 6 (<i>citing</i> <u>United States v. Asselin</u>, 775 F.2d 445, 446 (1st Cir. 1985); <u>United States v. Tumpter</u>, 669 F.2d 1215, 1222 (8th Cir. 1982)); <u>see</u> <u>also</u> <u>Brinegar v. United States</u>, 338 U.S. 160 (1949) (officer's knowledge of defendant's prior criminal activity); Advisory Committee's Notes to 2002 Amendments to Rule 41.

### 3.  Attenuation and Independent Source Doctrines

The government supplements its earlier discussion of the diversion of the shipping crate to Greensboro, NC, and the subsequent execution of the search warrant, with the following.

Although the record reflects that Task Force Officer Johnny Martin Ferrell (TFO "Ferrell") requested the diversion of the shipping crate to the Old Dominion facility in Greensboro, NC on May 16, 2003 (after the crate had left Point Loma, CA), the

6

shipping crate did not arrive in Morristown, TN, where it was thereafter diverted to Greensboro, NC, until nearly 5:00 pm on May 20, 2003. [Exhibit 2 to Def. Gillies' Motion to Suppress]. At that point in time, no diversion had taken place, as the scheduled delivery route from Point Loma, CA, to Dracut, MA, involved an initial segment from Old Dominion's Point Loma facility to its Morristown facility. See California v. Hodari D., 499 U.S. 621, 624 (1991) ("From the time of the founding to the present, the word 'seizure' has meant a 'taking possession.,'" (citations omitted)). Also at that point in time, TFO Ferrell's investigation of the shipping crate was complete. All of the information he eventually presented to a state court judge in support of a search warrant application was known to him no later than May 19, 2003. [See Affidavit of TFO Ferrell, ¶¶3-7].

Assuming for the purposes of this argument that the defendants have "standing" to contest the diversion of the shipping crate and the subsequent search, and that the diversion of the shipping crate to Greensboro, NC was an unlawful seizure under Fourth Amendment jurisprudence, but that the search warrant issued by the state court judge in North Carolina was supported by probable cause, the marijuana should not be suppressed under two related, but separate doctrines: (1) the attenuation doctrine; and (2) the independent source doctrine. Put another way, as long as the search warrant was supported by probable cause, even an unlawful diversion of the

shipping crate does not warrant the application of the exclusionary
rule and the suppression of the fruits of the search.

     A.    <u>The Attenuation Doctrine</u>

The attenuation doctrine stems from the notion that even when
illegal law enforcement conduct has tainted the discovery of
evidence, there are circumstances under which "the connection
between the lawless conduct of the police and discovery of the
challenged evidence has 'become so attenuated as to dissipate the
taint.'" <u>Wong Sun v. United States</u>, 371 U.S. 471, 487 (1963)
(<i>quoting</i> <u>Nardone v. United States</u>, 308 U.S. 338, 341 (1939)).
Thus, even if evidence did, in fact, come to light through a chain
of causation that began with a Fourth Amendment violation, it is
admissible if "the chain of causation proceeding from the unlawful
conduct has become so attenuated or has been interrupted by some
intervening circumstance so as to remove the 'taint' imposed upon
that evidence by the original illegality." <u>United States v. Crews</u>,
445 U.S. 463, 471 (1980).

Traditionally, courts assess whether taint has been attenuated
by considering factors such as (1) the amount of time elapsed
between the illegality and the acquisition of evidence, (2) the
presence of intervening circumstances, and (3) the purpose and
flagrancy of the misconduct.[4]  <u>Brown v. Illinois</u>, 422 U.S. 590,

---

    [4]Only the second and third factors are relevant to this case.
The intervening time factor is more important in confession cases,
or cases involving consent searches that follow an original

603-04 (1975); United States v. Monti, 557 F.2d 899, 903 (1977).
It is by no means necessary that each factor weigh in favor of
attenuation. See, e.g., United States v. McKinnon, 92 F.3d 244,
248 (4th Cir. 1996); United States v. Leonardi, 623 F.2d 746, 752
(2d Cir. 1980). Although the independent source doctrine (to be
discussed below) necessarily requires that an untainted source was
alone sufficient to uncover the challenged evidence, the
attenuation doctrine, which centers on the analysis of whether
there has been "dissipation of the taint," by its very nature
permits some causal connection between the illegal activity and the
discovery of the evidence in question. See United States v.
Ceccolini, 435 U.S. 268, 276 (1978); United States v. Leon, 468
U.S. 897, 911 (1984) ("We have declined to adopt a per se or 'but
for' rule that would render inadmissible any evidence that came to
light through a chain of causation that began with an illegal
arrest." (citing Brown, 422 U.S. 590 and Wong Sun, 371 U.S. at 487-
88)).[5]

---

illegality. See, e.g., Kaupp v. Texas, 538 U.S. 626, 633 (2003)
(confession not admissible because no record that substantial time
elapsed between defendant's illegal arrest and confession); United
States v. McCraw, 920 F.2d 224, 230 (4th Cir. 1990) (consent to
search home ineffective when given at time of illegal arrest in
home). Here, defendants were not present or involved in either the
seizure and diversion or the search warrant process.

[5]The Supreme Court has also held that "evidence will not be
excluded as 'fruit' unless the illegality is at least the 'but for'
cause of the discovery of the evidence." Segura v. United States,
468 U.S. 796, 815 (1984). It is not at all clear that the
diversion of the shipping crate to North Carolina, where a judicial

Here, the alleged original illegality is the seizure of the shipping crate by its diversion from Morristown, TN, to Greensboro, NC, where a search warrant was obtained from a neutral and detached judicial official, in this case, a state court judge.  The fact that the search warrant was issued by a judge in North Carolina only because of the diversion of the crate to that location does not taint the search with any illegality of the seizure.  Probable cause is a well-established legal standard ultimately to be applied by this Court to the facts presented in the search warrant affidavit.  It matters not one bit whether the issuing court was in Tennessee, North Carolina, or Massachusetts.  In any instance, it will be this Court that determines if the probable cause showing was sufficient to support the search warrant.  Assuming sufficient probable cause unrelated to the seizure and diversion, the issuance of a search warrant by a neutral and detached judicial official is an intervening circumstance that purges the discovery of the marijuana from any taint arising from its diversion to North Carolina.  See Segura, 468 U.S. at 814 ("The valid warrant search was a 'means sufficiently distinguishable' to purge the evidence of

officer authorized a search, meets even the threshold "but for" requirement.  One must assume that a neutral and detached judicial officer in North Carolina made the same probable cause decision that a neutral and detached judicial officer would have made in any other jurisdiction, including Tennessee and Massachusetts.  In any event, as discussed above, this Court's determination, if it makes it, that the search warrant was supported by adequate probable cause, makes the diversion irrelevant to the authorized search of the shipping crate.

any 'taint' arising from the entry." (*citing and quoting* <u>Wong Sun</u>, 371 U.S. at 488).

The Supreme Court has stated that the attenuation doctrine is an "attempt[] to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." <u>Leon</u>, 468 U.S. at 911 (*quoting* <u>Brown</u>, 422 U.S. at 609). "[I]n view of this purpose, an assessment of the flagrancy of the police misconduct constitutes an important first step in the calculus." <u>Leon</u>, 468 U.S. at 911 (*citing* <u>Dunaway v. New York</u>, 442 U.S. 200, 218 (1979) and <u>Brown</u>, 422 U.S. at 603-04).

Here, assuming the seizure and diversion of the shipping crate to be a Fourth Amendment violation, the misconduct was not flagrant. A seizure is generally less intrusive in nature than a search. <u>United States v. Chatwick</u>, 433 U.S. 1, 13-14, n. 8 (1977). A seizure affects only a person's possessory interests; a search affects a person's privacy interests. <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984). Moreover, here, where no one accompanied the shipping crate, no liberty interest is implicated. <u>United States v. LaFrance</u>, 879 F.2d 1, 5-6 (1st Cir. 1989). Even more importantly, any possessory interest in a shipped item is not significant until after a guaranteed delivery time.[6] <u>United States</u>

---

[6]It is questionable, and the government does not concede, that the seizure and diversion of the shipping crate, within the five-day expected delivery time, invaded the privacy rights of the

v. Allen, 990 F.2d 667, 672 (1st Cir. 1993) (*citing* LaFrance, 879 F.2d at 7 (before guaranteed delivery time, only possessory interest is contract-based expectancy that package would be delivered on time)).  Although Old Dominion did not contractually guarantee a five-day delivery to Dracut, MA, they did hold out the expectation that the shipping crate would take five business days (not counting drop-off and pick-up days) to arrive at their facility in Massachusetts.  Old Dominion took possession of the shipping crate on Thursday, May 15th.  The five-day period began the following day, Friday, the 16th, and continued on Monday, the 19th. Two days later, on May 21, 2003, and on only the fourth business day after drop-off of the shipping crate with Old Dominion, a state court judge cut-off any possessory interest the defendant might have had in the crate by judicially authorizing the seizure and search of the shipping crate.

Defendants might have had an expectation that the shipping crate would arrive in Massachusetts in five business days, but they had no expectation of, and no knowledge of, the route the crate would take to travel from California to Massachusetts.  If the crate could be delivered to Massachusetts in the expected five

---

defendants.  If no such violation occurred, neither defendant would be a "victim" of the seizure and diversion even if he otherwise had a legitimate expectation of privacy in the crate.  See Salemme, 91 F. Supp. 2d  at 382-83 ("to have Fourth Amendment rights an individual must have been a "'victim of an invasion of privacy.'" (*quoting* Alderman v. United States, 394 U.S. 165, 174 (1969) (*quoting* Jones v. United States, 362 U.S. 257, 261 (1960))).

days, it meant nothing to defendants whether the crate traveled through ten states, or twenty states, or whether it traveled through North Carolina, or not.[7]  The fact that the search warrant was issued in North Carolina, rather than Tennessee, had no effect on any possessory interest defendants had in the crate while it was en route from California to Massachusetts.

Nor did TFO Ferrell act with any intention to affect defendants' possessory right to a five-day expected delivery time if the shipment was lawful.  He was told by Old Dominion that if the shipping crate was not seized in Greensboro it could still be delivered to Dracut within the expected delivery time.[8]  [Affidavit of TFO Ferrell, ¶6].  And TFO Ferrell certainly worked diligently

---

[7]It follows that Gillies repeated complaint that the shipping crate was diverted 800 miles is misplaced.  If Old Dominion, because of scheduling or resource allocations, always routed California to Massachusetts shipments through its Greensboro facility, defendants would not have cared and would have had no complaint unless the routing extended the actual delivery time beyond the expected five days.  Thus, the fact that the shipping crate was diverted to North Carolina within the expected delivery time had no impact on their legitimate interests in the crate.  The issuance of the search warrant obviously stopped the five-day delivery clock, as Old Dominion lost possession of the shipping crate on May 21st when the judicially issued search warrant was executed.  Thereafter, any delay was authorized by law and was out of Old Dominion's hands.

[8]The search warrant was executed at 9:21 am.  If no contraband had been discovered, Old Dominion would have had the rest of that day, and all of the next day to deliver the shipping crate to Dracut.  There is no reason to believe that the shipping crate, absent an authorized seizure by TFO Ferrell, would not have reached Dracut in a timely fashion, just as Old Dominion had promised TFO Ferrell.

so that he would not be the cause of any delay if the shipment was not seized.  The shipping crate left Morristown, TN at about 8:20 pm on the evening of May 20th.  [Exhibit 2 to Def. Gillies' Motion to Suppress].  The search warrant was issued at 9:19 am on May 21st and executed at approximately 9:55 am that day when the shipment arrived at the docks of the Old Dominion facility in Greensboro.  [Exhibit 3 to Def. Gillies Motion, ¶10].

B.    The Independent Source Doctrine

The Supreme Court has made clear that "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . 'is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'"  Leon, 468 U.S. at 906 (quoting Illinois v. Gates, 426 U.S. 213, 223 (1983)).  Here, as was the case in Segura, "[w]hether the [seizure and diversion were] illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which the evidence was seized.  Exclusion of evidence as derivative or 'fruit of the poisonous tree' is not warranted here because of that independent source."[9]  Segura, 468 U.S. at 813-14.

_____

[9]Segura provides an interesting template for this case.  In Segura, police made an illegal entry into an apartment.  Although two members of the court concluded that "securing a dwelling, on the basis of probable cause, to prevent destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents," the majority decision determined that the illegal entry and occupation

Generally, even if evidence is linked to a Fourth Amendment violation, it is nevertheless admissible if knowledge of that evidence was derived from an "independent source." <u>Silverthorne Lumber Co. V. United States</u>, 251 U.S. 385, 392 (1920); <u>Nix v. Williams</u>, 467 U.S. 421, 443 (1984); <u>Murray v. United States</u>, 487 U.S. 533, 541-42 (1988).  The rationale for this doctrine is that "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." <u>Murray</u>, 487 U.S. at 542.  "When the challenged evidence has an independent source, exclusion of such evidence would put police in a worse position than they would have been in absent any error or violation." <u>Nix</u>, 467 U.S. at 443.

Here, nothing learned from the seizure of the shipping crate was used to obtain the search warrant.  In fact, the seizure was of no evidentiary significance, as TFO Ferrell was not present at the time of the diversion, and took no investigative steps, such as use of a drug dog, when the shipping crate was in Morristown, TN.  As noted above, TFO Ferrell's investigation was complete, and all of the information contained in his affidavit supporting issuance of

---

of the premises was "irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which the evidence was seized." <u>Segura</u>, 468 U.S. at 813-14.  <u>See</u> <u>also</u> <u>United States v. Grosenheider</u>, 200 F.3d 321, 330 (5th Cir. 2000) (court declined to resolve legality of seizure because of independent source of challenged evidence).  Similarly, here, because of the independent source doctrine, this Court need not decide whether the seizure and diversion of the shipping crate violated the Fourth Amendment.

the search warrant was known to him, by May 19th, the day before the shipping crate even arrived in Morristown, TN.    It was the execution of the search warrant, which was based on an investigation that was complete before any seizure occurred,  and not the seizure and diversion of the crate on May 20th in Tennessee, that led to the discovery of the marijuana.

The fact that the seizure and diversion led to the particular state court judge in North Carolina being the issuing judicial official does not preclude the completed investigation from being independent from the seizure and diversion.  There is no suggestion that the issuing judge did not fulfill the constitutional requirement that search warrants be issued by a "neutral, detached officer capable of determining whether probable cause existed for the requested search."  United States v. Mitro, 880 F.2d 1480, 1485-86 (1st Cir. 1989).  This Court has the final say as to whether the supporting affidavit of TFO Ferrell presented the state court judge with an adequate basis to conclude that there was a fair probability that contraband or evidence of a crime would be found in the shipping crate. United States v. Caggiano, 899 F.2d 99, 102 (1st Cir. 1990).  Whether the issuing judicial officer was in Tennessee, North Carolina, or Massachusetts is not of constitutional significance.  The only relevant questions for this Court are whether the information provided to a neutral and detached judicial officer was independent from any illegality

16

involving the seizure and diversion, and whether that information established probable cause to believe that the shipping crate contained illegal controlled substances.    The answer to both questions is in the affirmative.

### 4.    Rule 41

Gillies misstates the law when he states that "Federal Rule of Criminal Procedure 41 governs searches and seizures conducted in relation to federal cases."[10] [Gillies' Memo, 18].  More accurately, it can be said that:

> The products of a search conducted under the authority of a validly issued state warrant are lawfully obtained for federal prosecutorial purposes if that warrant [1] satisfies constitutional requirements and [2] does not contravene any Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers.

United States v. Krawiec, 627 F.2d 577, 580, n. 4 (1st Cir. 1980) (*quoting* United States v. Sellers, 483 F.2d 37, 43 (5th Cir. 1973); see also Mitro, 880 F.2d at 1485 (same); Soule, 908 F.2d at 1038 (same).

In this case a local police officer, who was also a sworn officer on a regional drug task force administered by DEA, applied in his capacity as a High Point Police Detective to a Superior Court Judge in Greensboro, NC for a search warrant.    The

---

[10]It is of course well established that "[f]ederal law governs the admissibility of evidence in federal criminal trials, [citations omitted], including evidence seized pursuant to a state court warrant, [citation omitted], and evidence obtained in the course of a state investigation." Soule, 908 F.2d at 1039, n. 13.

application provided the state court judge with probable cause to believe that the controlled substances laws of the State of North Carolina had been violated, and that evidence of that crime or crimes would be found in the shipping crate.  In all respects, the search warrant in this case was a validly issued state court search warrant.  See Krawiec, 627 F.2d at 578-79 (state court search warrant obtained by federal agent "was properly a state warrant which did not have to fulfill all the special demands of a federal warrant").  Although there was no joint investigation in the sense of both state and federal officers involved, at most it can perhaps be called a joint investigation in the sense that one officer, with both state and federal police powers, obtained a valid state search warrant without knowing the forum (between state court and federal court) in which any eventual criminal violations would be prosecuted.

The government is prepared to show, consistent with fair inferences from the record, that TFO Ferrell did not and could not have known where any eventual prosecution would take place.  He had no direct knowledge of the contents of the shipping crate.  As is evident from his search warrant application, he did not even know the particular controlled substance he believed was in the crate, and he certainly had no way to know the quantity of any drugs in the crate, which usually drives the choice between state or federal

prosecution.[11] In fact, the quantity of marijuana seized and then subject to a successful controlled delivery, was a marginal case for this office to prosecute, as the quantity was just over the 100 kilo threshold for a minimum mandatory sentence.  As the First Circuit stated in both Krawiec and Soule:  a "federal agent who is not sure . . . that any later prosecution will be federal should not be compelled to obtain from a state or a federal court a federal warrant with its special procedural requirements." Krawiec, 627 F.2d at 582; Soule, 908 F.2d at 1038.

With respect to the two requirements that a state court warrant must satisfy for the use of the fruits of the search to be admissible in federal court, first, "constitutional requirements are satisfied so long as there was probable cause to support the issuance of the warrant."  Soule, 908 F.2d at 1039 (citing U.S. Const. Amend. IV).  As argued both above and in the government's earlier opposition memorandum, the affidavit of TFO Ferrell satisfies the probable cause standard.

Second, the rule-embodied policy intended to preserve the integrity of federal court proceedings and guide the conduct of federal law enforcement officers "is implemented primarily though

---

[11]The weight of the shipping crate, 600 pounds, gave no indication of the weight of any controlled substances hidden inside.  The shipping crate could just as well have included heavy test equipment, as described on the bill of lading, and a small (by comparison to the 235 pounds of marijuana seized) quantity of cocaine.

19

the requirement that search warrants be issued by a 'neutral, detached officer capable of determining whether probable cause existed for the requested search.'" Soule, 908 F.2d at 1040 (*citing* Mitro, 880 F.2d at 1485-86; *accord* Shadwick v. City of Tampa, 407 U.S. 345, 350 (1972)). In Sellers, from which the First Circuit developed the protocol for considering the admissibility of the fruits of a state search warrant, the Fifth Circuit elaborated on this second requirement as follows: "The proper test to be applied is whether a particular Rule 41 standard is one designed to assure reasonableness on the part of federal officers, or whether the provision merely blueprints the procedures for issuance of federal warrants." Sellers, 483 F.2d at 44. Under either rubric, the issuance of a state search warrant by a Superior Court Judge satisfies the requirements that must be met for the fruits of a state search warrant to be admitted in a federal prosecution.

Gillies' claimed violation of Rule 41 is that a state court judge issued the search warrant when a federal magistrate judge was not unavailable.[12]  Fed. R. Crim. P. 41(b)(1).  It makes perfect

---

[12]Gillies also claims that Rule 41(b)(1) was violated by rerouting the crate into the Middle District of North Carolina for the purpose of seeking a search warrant.  Apparently, he believes that the grant of authority to issue a search warrant "to search for and seize a person or property within the district" was violated.  That is not the case.  First, when the search warrant was issued at 9:21 am on May 21st, the government believes that the shipping crate was already in the Middle District of North Carolina.  Even if it was not the case, the application sought a warrant that would become valid only "when the crate arrives on the docks of Old Dominion Freight Lines terminal located at 4715 Evans

sense that evidence should not be suppressed on such a basis.  This Court can make the determination that the constitutional requirement of probable cause was been satisfied, and there is no suggestion in the records that the state court judge was not a "neutral, detached officer capable of determining whether probable cause existed for the requested search."  It follows that the fact that the warrant was issued by a state court judge instead of a federal magistrate judge is of no consequence to the integrity of the search or the rights of the defendants.[13]  Moreover, the two-prong standard the First Circuit has articulated for the admission of  the fruits of a state search warrant in a federal prosecutions is easily met in this case.  See, e.g., Krawiec, 627 F.2d at 580, n. 4.

---

Town Road, Greensboro, NC."

[13]It also follows that defendants were not prejudiced by the issuance of the search warrant by a state court judge.  Defendants' argument to the contrary merges the seizure and diversion of the crate with the search of the crate.  Rule 41 issues are limited to the search of the shipping crate under the state search warrant. Rule 41 is irrelevant to the seizure and diversion of the crate. The fact that the search was conducted after the diversion does not change the nature of the search, or make it more abrasive than it would have been if Rule 41 had been followed.  See United States v. Antrim, 389 F.3d 276, 282 (1st Cir. 2004).

**CONCLUSION**

For the reasons stated above, as well as those advanced in the government's earlier opposition memorandum, this Court should deny on the papers the suppression motions of Joshua Goldsmith and John Gillies.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By:  /s/ Timothy Q. Feeley
                              TIMOTHY Q. FEELEY
                              Assistant U.S. Attorney
                              (617) 748-3172

October 21, 2005


_____ CERTIFICATE OF SERVICE

This is to certify that I have this 21st day of October 2005 served upon defendants' counsel, John Salsberg and Stephen Hrones, a copy of the foregoing document by first class mail.

                              /s/ Timothy Q. Feeley
                              TIMOTHY Q. FEELEY
                              Assistant U.S. Attorney