UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
        V.               )    CRIMINAL NO. 03-10234-MLW
                         )
JOSHUA GOLDSMITH (3)     )

### GOVERNMENT'S REQUEST FOR FINDINGS OF FACT AND RULINGS OF LAW, AND SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT'S SUPPRESSION MOTION

In compliance with this Court's order of November 18, 2005, amended by its order of December 4, 2005 extending the time for filing, the government hereby submits this supplemental memorandum in opposition to the defendant Joshua Goldsmith's ("Goldsmith") motion to suppress the approximately 200 pounds of marijuana seized from a shipping crate in Greensboro, NC, on May 21, 2003, pursuant to a search warrant issued by a Superior Court Judge of the State of North Carolina. Herein, the government asks this Court to make certain findings of facts and rulings of law.

As a preliminary matter the government will set out the issues it considers framed by Goldsmith's motion and the recent evidentiary hearing. As the Court knows, the wooden shipping crate (the "crate") containing the marijuana sought to be suppressed was being shipped by Old Dominion Freight Lines ("ODFL") from San Diego, CA to Dracut, MA. At the request of law enforcement, the crate was diverted from Morristown, TN to Greensboro, NC, instead of traveling directly from Morristown to Dracut. Goldsmith argues that the diversion of the crate to North Carolina was an

unconstitutional seizure, and the marijuana should be suppressed under the fruit of the poisonous tree doctrine. He argues alternatively, that even if the diversion was lawful, the subsequent search of the crate in North Carolina violated his Fourth Amendment rights.

The government will address the following issues:

1) Whether the diversion of the shipping crate to North Carolina was an infringement of Goldsmith's Fourth Amendment rights, permitting him to challenge the diversion;

2) Whether, assuming Goldsmith's "standing" to contest the diversion, the seizure of the crate was reasonable under all the circumstances;

3) Whether, assuming an unlawful diversion, the marijuana should not be suppressed because of the attenuation and/or independent source doctrines;

4) Whether Goldsmith had a legitimate expectation of privacy in the shipping crate that permits him to challenge the North Carolina search of the crate;

5) Whether, assuming a legitimate expectation of privacy in the shipping crate, the affidavit submitted in support of the search warrant established probable cause to believe that unlawful controlled substances were in the shipping crate;

6)     Whether, assuming a legitimate expectation of privacy in
the shipping crate, the failure to disclose to the
issuing judicial officer that the shipping crate had been
diverted to North Carolina at the request of law
enforcement requires suppression of the marijuana under
<u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

## I.    **THE DIVERSION OF THE SHIPPING CRATE**

### A.    <u>Requested Findings of Fact</u> (Diversion Issue Only)

1.    At approximately 10:30 pm, on May 15th,[1] the shipping
crate containing the marijuana (the "crate") was received for
shipment at ODFL's San Diego service center. [Ex. 5; Stephany, Day
1, 43-44]. Goldsmith delivered the crate to ODFL [Aff. of
Goldsmith, ¶1], and provided ODFL with a copy of his driver's
license, which ODFL requires from any person delivering freight
directly to its service centers, or from any person receiving
freight directly from a service center. [Ex. 4; Stephany, Day 1].

2.    The crate was consigned for shipment to Dracut, MA, to be
received at ODFL's Dracut service center by DVP Diving & Video.
[Ex. 2]. ODFL does not guarantee delivery times unless an extra
fee (i.e. premium) is paid. [Stephany, Day 1, 48]. No such fee was
paid or charged in this case, so that the crate was not shipped

---

[1]All dates herein, unless otherwise noted, are dates in 2003.
All times are Greensboro, NC, times, even if reflecting an event
that occurred in California or another location in a different time
zone. Citations to the transcript of the two day evidentiary
hearing are referenced by witness, day, and page.

under a guaranteed shipping time.

3.    Although not shipped under a guaranteed shipping time, ODFL did hold out in 2003 an expected shipping time of five business days for freight from San Diego to Dracut, not counting the drop-off day.  For the crate, delivered to ODFL on May 15th for shipment to Dracut, the expected receipt date in Dracut was May 22nd.  An expected shipping time is not a contractual obligation and there is no customer recourse if ODFL fails to deliver freight within an expected delivery time.  [Stephany, Day 1, 48-49].

4.    Freight routes from San Diego to Boston can vary depending on where freight within ODFL's system is originating from and destined to.  [Stephany, Day 1, 49-50].  ODFL's cost of doing business at various facilities also is a factor that affects shipping routes. [Stephany, Day 1, 95-96].  The crate went to Morristown, but it could have gone to another "break bulk" (i.e., hub) facility.  [Stephany, Day 1, 49-50].  On a shipment from San Diego to Dracut, using Morristown or Greensboro as the initial break bulk makes the most sense from ODFL's business perspective. [Stephany, Day 1, 95].  ODFL does not commit to a particular route and never provides shippers with information about the particular route that a shipment will take, leaving route selection totally within its discretion. [Stephany, Day 1, 50].

5.    Immediately upon receipt of the crate, ODFL scheduled the crate for shipment from San Diego to Morristown, TN.  [Ex.5;

4

Stephany, Day 1, 44]. At 4:13 am on May 16th, the trailer containing the crate was closed, sealed, and ready for transport to Morristown, TN. [Ex. 5; Stephany, Day 1, 45]. Although a trailer can be opened after it is closed and sealed to a destination, that is an uncommon occurrence, and did not occur in this case. [Stephany, Day 1, 109-110].

6.    Shortly before 11:30 am May 16th, Geoff Stephany ("Stephany") conducted a standard check of ODFL's computer tracking system, looking for suspicious shipments that might contain contraband. [Stephany, Day 1, 33-34]. He identified the crate as such a suspicious shipment after reviewing the bill of lading [Ex. 2] and noting that it was cash transaction (i.e. collect), a large wooden crate, and was both a delivery to dock and a "will-call," or dock pick-up. [Stephany, Day 1, 35-36, 109]. At 11:30 am, Stephany faxed, after a phone conversation, a copy of the bill of lading and a copy of Goldsmith's driver's licence to DEA Task Force Officer Marty Ferrell ("Ferrell"). [Exs. 2-4; Stephany, Day 1, 39]. Stephany works at ODFL's headquarters, just outside Greensboro, NC. [Stephany, Day 1, 20-21]. Ferrell works in the DEA office in Greensboro. [Ferrell, Day 1, 118]. Stephany's practice in 2003 was to perform a suspicious shipments check daily, or at least as close to daily as possible, and to refer suspicious packages to Ferrell for law enforcement investigation. [Stephany, Day 1, 31-33].

7.    Late afternoon or early in the evening of May 16th, after

learning about Goldsmith's prior criminal record involving marijuana distribution, and an association of a suspected narcotics trafficker with one of the phone numbers on the bill of lading, Ferrell contacted Stephany and asked him to have the crate delivered to ODFL's Greensboro service center. [Stephany, Day 1, 51; Ferrell, Day 1, 123-125]. It was Ferrell's intention to investigate further to see if probable cause for a search warrant could be developed, and, if not, use a drug dog to check the crate for that same purpose. [Ferrell, Day 1, 125]. Stephany agreed and contacted ODFL's service center in Morristown, and ODFL's central dispatch to ensure that the crate was shipped from Morristown to Greensboro. [Stephany, Day 1, 51]. When Stephany requested the diversion of the crate to Greensboro, he believed that the expected five-day shipping time would be met if the crate was not seized by Ferrell. [Stephany, Day 1, 52, 59, 110]. Ferrell had the same belief. [Ferrell, Day 1, 128].

8.  The trailer with the crate left San Diego for Morristown on May 19th at 12:25 am. [Ex. 5]. It arrived in Morristown on May 20th at 4:47 pm, after having been driven by a two-person team of drivers. [Ex. 5; Stephany, Day 1, 45-46, 53].

9.  On May 19th, before the trailer and crate arrived in Morristown, Ferrell's investigation of the shipment was complete. [Ferrell, Day 1, 187]. At that time, in addition to the delivery to dock and will-call pick-up, the criminal record of Goldsmith,

and the association of a suspected narcotics trafficker with a phone number on the bill of lading, Ferrell knew that the shipper's name and address and the consignee's name were fictitious, and the consignee's address was false. [Ferrell, Day 1, 186]. He mistakenly thought that the shipment had been pre-paid in cash. The crate was actually sent collect, with freight charges due from the consignee. [Ex. 2].

10.    A different trailer, with the crate aboard, was closed and sealed to Greensboro on May 20th at 9:45 pm. It left Morristown for Greensboro on May 21st at 2:31 am. [Ex. 5; Stephany, Day 1, 54]. The trailer arrived in Greensboro on May 21st at 7:14 am. [Ex. 5; Stephany, Day 1, 54].

11.    Law enforcement took control of the crate when it departed Morristown, TN, on May 21st at 2:31 am for delivery to ODFL's Greensboro, NC facility.[2]  The shipment of the crate from San Diego to Morristown was scheduled by ODFL before the diversion request by Ferrell, so there was no actual diversion of the crate

_____

[2]It is in this sense that the government conceded that the crate had been seized in Morristown by law enforcement. [Day 2, 78]. There was no intention to use the word "seize" in the sense of an "unlawful seizure." The government agrees that the actual diversion, when the crate began moving at the direction of law enforcement, implicates the Fourth Amendment because the government exerted control over the crate. United States v. Jacobsen, 466 U.S. 109, 120 (1984). The government does not agree that the diversion constituted a meaningful interference with Goldsmith's possessory interests in the crate, or if it did, that it constituted an unreasonable seizure in violation of the Fourth Amendment.

7

until it was shipped on May 21st to Greensboro instead of Dracut. Except for law enforcement's diversion request, the crate would have been placed on a different trailer that left Morristown on May 21st at 8:50 am, traveled directly from Morristown to Dracut, MA, and arrived in Dracut on May 22nd at 12:03 am. [Exs. 5, 8, 9; Stephany, Day 1, 55-58].

12.   A search warrant authorizing the search of the crate was signed by a North Carolina Superior Court Judge on May 21st at 9:19 am. [Ex. 11].   The search warrant affidavit contained no facts learned by Ferrell after the crate had arrived in Morristown. Ferrell went directly to ODFL's Greensboro service center and executed the search warrant shortly before 10:00 am that day. [Ex. 14; Ferrell, Day 1, 133-134].   If Ferrell had not seized the shipping crate at that time, ODFL would have delivered the crate to Dracut either later on May 21st or on May 22nd. [Stephany, Day 1, 59].

13.  The crate in this case was already in Greensboro for over an hour and a half before the direct Morristown to Dracut trailer left Morristown.   The crate was searched in Greensboro under a search warrant that was issued only 29 minutes after the direct Morristown to Dracut trailer left Morristown, and the crate was seized under the warrant fourteen hours (at 9:55 am. per Ex. 14) before the direct Morristown to Dracut trailer arrived in Dracut (at 12:03 am on May 22nd).

B.    **Requested Rulings of Law** (Diversion Issue Only)

1.    A wrapped parcel delivered to a private freight carrier is an "effect" within the meaning of the Fourth Amendment. United States v. Jacobsen, 466 U.S. 109, 114 (1984); United States v. LaFrance, 879 F.2d 1, 4 (1st Cir. 1989).

2.    Because the diversion of the crate did not involve a search of its contents, Goldsmith's privacy interests are not implicated by the diversion of the crate to Greensboro. Jacobsen, 466 U.S. at 113; United States v. Van Leeuwen, 397 U.S. 249, 253 (1970).

3.    Because Goldsmith did not accompany the crate on its route from San Diego to Dracut, his liberty interests are not implicated by the diversion of the crate to Greensboro. United States v. Place, 462 U.S. 696, 708 (1983); Lafrance, 879 F.2d at 5-6.

4.    "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." Jacobsen, 466 U.S. at 113. A seizure is generally less intrusive in nature than a search. United States v. Chatwick, 433 U.S. 1, 13-14, n. 8 (1977).

5.    This case involves "purely possessory interests." LaFrance, 879 F.2d at 6.

6.    Goldsmith had no contractual right to any particular route being used by ODFL to ship the crate from San Diego to

Dracut.  Although ODFL did not contractually guarantee a delivery time of the crate, it held out to Goldsmith an expected shipping time of five business days.  Even if the expected delivery time is treated as if it was guaranteed, there was no meaningful interference with Goldsmith's possessory interest in the crate caused by the diversion of the crate to an ODFL facility in Greensboro that occurred well before the expiration of the expected shipping time, and would not have prevented ODFL from delivering the crate to Dracut in a timely fashion in the event it had not been seized by law enforcement under the North Carolina search warrant.  See LaFrance, 879 F.2d at 7 ("[T]he only possessory interest at stake before Thursday noon was the contract-based expectancy that the package would be delivered to the designated address by morning's end.").  Any obligation of ODFL to deliver the crate to Dracut on or before May 22nd expired upon the court authorized seizure of the crate on May 21st.  Therefore, the diversion of the crate to Greensboro, NC, did not infringe Goldsmith's Fourth Amendment rights, and the marijuana will not be suppressed as fruit of the poisonous tree based on the diversion.

7.  Even if Goldsmith can challenge the diversion of the crate, it is only unreasonable seizures that violate the Fourth Amendment.  LaFrance, 879 F.2d at 6.  Under all the circumstances of this case, which easily establish articulable suspicion, and in fact probable cause, before the diversion of the crate to

Greensboro, and balancing the extent of the intrusion against the governmental interests asserted in support of the diversion, the diversion of the crate to Greensboro was not an unreasonable seizure.

8.    Even if the diversion of the crate to Greensboro was unlawful, and the marijuana was discovered through a chain of causation that began with a Fourth Amendment violation, the marijuana need not be suppressed if "the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." United States v. Crews, 445 U.S. 463, 471 (1980). Here, the issuance of a search warrant by a neutral and detached judicial official, based only on facts known to law enforcement before the diversion, is an intervening circumstance that removes any taint from the diversion. Segura v. United States, 468 U.S. 796, 814 (1984) (citing and quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963) ("The valid warrant search was a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from the entry.").  Therefore, the marijuana will not be suppressed as the fruit of an unlawful diversion.

9.    Even if the diversion of the crate to Greensboro was unlawful, the marijuana is nevertheless admissible if knowledge of that evidence was derived from an "independent source."

Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920);
Murray v. United States, 487 U.S. 533, 541-42 (1988).  Here, all
facts contained in the search warrant affidavit were known to law
enforcement prior to the diversion.  No facts were acquired because
of or as a result of the diversion.  Therefore, whether the
diversion was illegal or not is irrelevant to the admissibility of
the marijuana because there was an independent source for the
warrant under which the marijuana was seized.  Exclusion of the
marijuana as derivative or "fruit of the poisonous tree" is not
warranted here because of that independent source.  Segura, 468
U.S. at 813-14.

    **C.**  **Discussion In Support of Rulings of Law**

    In Rakas v. Illinois, 439 U.S. 128, 138 (1978) (*citing* Simmons
v. United States, 390 U.S. 377, 389 (1968)), the Supreme Court
essentially merged the issues of standing and the merits of a
Fourth Amendment claim into a single inquiry, and reaffirmed the
principle that the "rights assured by the Fourth Amendment are
personal rights, [which] . . . may be enforced by exclusion of
evidence only at the instance of one whose own protection was
infringed by the search and seizure."  The Court explained:

> [W]e think the better analysis forthrightly focuses on
> the extent of a particular defendant's rights under the
> Fourth Amendment, rather than on any theoretically
> separate, but invariably intertwined concept of standing.
> . . .  Analyzed in these terms, the question is whether
> the challenged search or seizure violated the Fourth
> Amendment rights of a criminal defendant who seeks to
> exclude the evidence obtained during it.  That inquiry in

turn requires a determination of whether the disputed
search and seizure has infringed an interest of the
defendant which the Fourth Amendment was designed to
protect.

Id. at 139-140.

Here, the issues of standing and the merits of Goldsmith's
Fourth Amendment claim are merged, not only as a matter of legal
analysis, but also as a matter of factual analysis. That is so
because Goldsmith lacks the right to challenge the diversion
because the diversion did not infringe the only protected interest
he had in the crate, a possessory interest. In other words, he
lacks standing to contest the diversion because the diversion was
not a Fourth Amendment violation.[3]

Goldsmith had no right, interest, or expectation that the
crate would take a particular route from San Diego to Dracut. The
selection of the route to Dracut was at ODFL's absolute discretion.
The route of a specific piece of freight through ODFL's system at
any particular time depends on the origin and destination of all of

---

[3]In Rakas, the Supreme Court made it clear that its decision
did not cast doubt on cases which recognize that generally the
issue of standing involves two inquires: "first, whether the
proponent of a particular legal right has alleged 'injury in fact,'
and, second, whether the proponent is asserting his own legal
rights and interests rather than basing his claim for relief upon
the rights of third parties." Rakas, 439 U.S. at 139. Here,
Goldsmith does not get past the first inquiry, which in fact is
also a "merits" inquiry. He was not injured in fact by the
diversion because he had no contractual right to any particular
route from San Diego to Dracut, and the diversion did not infringe
or adversely impact his possessory interest in a timely delivery of
the crate.

the freight moving within its nationwide system, influenced by other business factors such as its resources and its costs of doing business.  ODFL could have sent the crate directly to its break bulk facility in Greensboro, instead of a similar facility in Morristown, TN.  Goldsmith also had no contractual, enforceable right that the crate would arrive in Dracut on May 22nd, five business days after its delivery to ODFL in San Diego.  But even if this Court concludes that ODFL's expected shipment time gave Goldsmith an enforceable possessory interest, that interest was not infringed by the diversion to Greensboro, which occurred well before the expiration of the expected shipping time.  Even treating the expected shipment time as a guaranteed time, unless and until ODFL failed to deliver the crate to Dracut by May 22nd, no "injury in fact" to Goldsmith's protected Fourth Amendment rights occurred.  See LaFrance, 879 F.2d at 7 ("detention" of the package prior to the noon guaranteed delivery time "had but a de minimis impact on a nearly evanescent possessory interest.").[4]

---

[4]It is true that the First Circuit, at this point in its opinion, noted that "there was neither interference with the package's normal course nor frustration of appellee's contractual expectations."  It can be said that in a sense the officers in LaFrance did interfere with the package's normal course.  Although the package went to Lewiston, as addressed, it was delivered by FedEx to the police station, and not to its own facility, or to the addressee.  LaFrance, 879 F.2d at 3.  However, here, there was no interference with the package's normal course, as there was no set shipment route between San Diego and Dracut.  Geoff Stephany specifically stated that Morristown or Greensboro were the two most logical break bulks to handle freight from San Diego to Dracut.  [Stephany, Day 1, 95].  Given that the route selected by ODFL to

Because the officers in <u>LaFrance</u> detained the FedEx package beyond its guaranteed delivery time, the First Circuit assessed the reasonableness of the seizure, as it is only unreasonable seizures that violate the Fourth Amendment. <u>LaFrance</u>, 879 F.2d at 6 ("In a parcel detention case, . . . reasonableness remains the focus of judicial inquiry."). <u>See also</u> <u>Jacobsen</u>, 466 U.S. at 120 ("While the agents' assertion of dominion and control over the package and its contents did constitute a 'seizure,' that seizure was not unreasonable."); <u>Van Leeuwen</u>, 397 U.S. at 253 (on facts of case, "a 29-hour delay between mailings and the service of the warrant cannot be said to be 'unreasonable' within the meaning of the Fourth Amendment."). The First Circuit did so by "weigh[ing] the length of the detention and its impact upon the defendants' fourth amendment interests against the importance of law enforcement concerns said to justify interdiction. <u>LaFrance</u>, 879 F.2d at 6. <u>See also</u> <u>Place</u>, 462 U.S. at 703 ("We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.").

---

ship the crate to Dracut was within its sole discretion, and Goldsmith had no contractual or other interest in the selection of the route, the diversion of the crate in this case to Greensboro is not substantively different than the diversion of the FedEx package in <u>LaFrance</u> to the police station. In fact, here, the crate never left ODFL's possession, while in <u>LaFrance</u> the officers took and maintained physical possession of the package at their stationhouse.

Assuming that this Court finds a meaningful infringement upon Goldsmith's possessory interests in the crate so that Goldsmith can legitimately contest the merits of the diversion, it should still find the seizure of the crate to be reasonable under all of the circumstances. First, the Supreme Court, has recognized the reasonableness "of warrantless seizures of personal luggage from the custody of the owner on the basis of less than probable cause, for the purpose of pursuing a limited course of investigation, short of opening the luggage, that would quickly confirm or dispel the authorities's suspicion." Place, 462 U.S. at 720. Here, the initial decision to seize is even more easily justified. The property involved was not personal luggage, and it was not in the custody of Goldsmith, or any of his co-conspirators. Even when Ferrell initially requested diversion of the crate on May 16th, the facts then known to him easily satisfy the articulable suspicion standard of Terry v. Ohio, 392 U.S. 1 (1968). When the government actually took control of the crate upon its departure from Morristown on a Greensboro-bound trailer on May 21st, articulable suspicion had blossomed into probable cause.

The government's interest in diverting the suspicious crate to Greensboro was the same as that recognized by the First Circuit in LaFrance to be compelling: "The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit." LaFrance, 879 F.2d at 7 (quoting Place, 462 U.S. at 703

(*quoting* <u>United States v. Mendenhall</u>, 446 U.S. 544, 561 (1980)
(opinion of Powell, J.))). Goldsmith's possessory interest in the
crate, even if substantial enough to permit him to challenge the
diversion, pales by comparison to the government's compelling
interest. He had a non-contractual, non-enforceable expectation
that the crate would arrive in Dracut by May 22nd. The search of
the crate and the seizure under the search warrant took place at
about 10:00 am on May 21st, well within the expected delivery time.
He had no right, or even an expectation, that the crate would take
any particular route to Dracut, or that it would not go through
ODFL's break bulk facility in Greensboro. At most, the
government's diversion of the crate had a *de minimus* impact on his
possessory interests.

After an assessment of the competing interest, the next step
is "to assay the reasonableness, that is, the net intrusive impact,
of the police action." <u>LaFrance</u>, 879 F.2d at 7. There are "three
presumptively-relevant factors: (1) investigative diligence, (2)
length of detention, and (3) information conveyed to the suspect."[5]
<u>Id</u>.

---

[5]The <u>LaFrance</u> court noted that the factors were developed for
use in luggage detention cases. The court recognized that "common
sense insists that they be used more circumspectly, and weighed
somewhat differently, where no liberty interest looms." <u>LaFrance</u>,
879 F.2d at 8. More specifically, the court concluded that where,
as here, "detention occurs after the owner has relinquished control
of an inanimate object to a third party, we doubt that [the
information factor] has much (if any) relevance." <u>Id</u>. at 9.

Ferrell did not act with any intention to affect Goldsmith's possessory right to a five-day expected delivery time if the shipment was lawful. He was told by ODFL that if the shipping crate was not seized in Greensboro it could still be delivered to Dracut within the expected delivery time. [Ferrell, Day 1, 128]. Although Geoff Stephany did not remember any discussion of shipping times, he was emphatic that the diversion to Greensboro would not have prevented the crate, if it was not seized under the search warrant, from arriving in Dracut within the five-day expected shipment time. [Stephany, Day 1, 52, 59, 110]. And Ferrell certainly worked diligently so that he would not be the cause of any delay if the shipment was not seized. He worked over the weekend of May 17th and 18th, and on May 19th completed his investigation that supported, in his view, probable cause to obtain a search warrant, even before the crate arrived in Morristown. [Ferrell, Day 1, 126, 187]. The crate left Morristown at 2:31 am on May 21st, arrived in Greensboro at 7:14 am on May 21st, and was unloaded to the dock no earlier than 8:46 am that same day. [Ex. 5]. The search warrant was issued at 9:19 am on May 21st and executed as soon as possible thereafter, at approximately 9:55 am, at the docks of the ODFL break bulk facility in Greensboro. [Ex. 14].

The length of detention also favors the reasonableness of the government's conduct. A comparison between the transport of a

18

second, unrelated piece of freight bound from San Diego to Dracut
that was on the same trailer that took the crate in this case to
Morristown, to the diversion of the crate to Greensboro, is
instructive. The crate in this case left Morristown for Greensboro
at 2:31 am on May 21st, more than six hours before the other piece
of freight left Morristown for Dracut at 8:50 am that day. If the
crate in this case had not been diverted to Greensboro, it too
would not have left Morristown until 8:50 am on May 21st. Twenty-
nine minutes later, a Superior Court Judge signed the search
warrant. Sixty five minutes later the search warrant was executed
and the crate was seized under the warrant.[6] At that time, the
other piece of freight, was still approximately 14 hours from
arrival in Dracut, and the expiration of the expected five day
shipping time was 38 hours away (i.e., midnight on May 22nd).

LaFrance gives no indication that the diversion of the crate
to North Carolina is of any constitutional significance. First,
and without doubt, Goldsmith's possessory interests in the crate
were infringed no differently, if they were infringed at all, by

---

[6]The time of detention, which is not determinative of the
reasonableness of the detention, can be measured in different ways.
It can be said to have started at 2:31 am on May 21st, and to have
ended just before 10:00 am that day when the warrant was executed
(i.e. seven and one-half hours). It can also be said to have
started only when the crate otherwise would have left Morristown
for Dracut, at 8:50 am on May 21st, and ended just before 10:00 am
that day when the warrant was executed (i.e. about 65 minutes). It
is this second and shorter detention time that accurately reflects
the time that the crate was under law enforcement control and was
not traveling in the way it would have but for the diversion.

the diversion of the crate to Greensboro than they would have been if Ferrell had directed ODFL to hold the crate in Morristown, and then obtained the assistance of Tennessee law enforcement officials and they executed a Tennessee search warrant on the crate at 9:55 am on May 21st.  Moreover, even if the diversion added some intrusion into Goldsmith's protected rights, <u>LaFrance</u> rejected a standard that would require government agents to adopt the least intrusive means possible.  <u>LaFrance</u>, 879 F.2d at 4.  As the court stated: "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."  <u>Id</u>. at 5.  Here, Ferrell did not act unreasonably in not referring this matter to law enforcement personnel in another state.

Ferrell was located near ODFL's headquarters in North Carolina.  He had an existing professional relationship with ODFL's head of security, and became involved in this matter at Geoff Stephany's behest.  He also had a national trucking company that was willing to act as a concerned citizen, when it was under no obligation to do so, and to assist law enforcement in drug interdiction by providing investigative leads to possible interstate shipments of controlled substances.  It was not unreasonable for Ferrell to want to follow-up personally on the information provided by ODFL, and not have to rely on other law enforcement personnel in other parts of the country to prioritize

a fast-moving investigation.    Ferrell knew he would conduct an immediate investigation and follow it through to its conclusion, and in fact worked over the weekend to do so.    He should not be faulted or found to have acted unreasonably for not "punting" this matter to Tennessee or Boston.    Although Boston was willing to oversee a controlled delivery, that was after the nearly 200 pounds of marijuana had been seized under the North Carolina warrant. Ferrell could make no assumption that Boston would have been willing and able to do the work necessary to seek, obtain, and execute a warrant in a timely fashion.    Ferrell knew he would work diligently to try to develop probable cause to obtain a search warrant, and demonstrating to ODFL that he appreciated its investigative leads by showing ODFL the positive results of its referral in this case served an important law enforcement purpose. [Ferrell, Day 1, 180-183].

Finally, and briefly, the government will rely on its earlier submission about the applicability of the attenuation and independent source doctrines in the event that this Court finds that the diversion of the crate violated Goldsmith's Fourth Amendment rights.    However, the government will merely note, consistent with its earlier submission, that the evidentiary hearing established that all facts contained in the search warrant affidavit were known to Ferrell no later than May 19th, even before the crate arrived in Morristown.    It follows that the legality of

the diversion is irrelevant to whether the marijuana should be suppressed. Segura, 468 U.S. at 813-14 (the illegal entry and occupation of the premises was "irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which the evidence was seized."). See also United States v. Grosenheider, 200 F.3d 321, 330 (5th Cir. 2000) (court declined to resolve legality of seizure because of independent source of challenged evidence).

## II.   THE RIGHT OF GOLDSMITH TO CONTEST THE SEARCH OF THE CRATE

### A.   Requested Findings of Fact (Standing Issue Only)

1.    The crate was delivered to ODFL's San Diego service center by Goldsmith. "Deliveries to dock," as opposed to local pick-ups by ODFL, are rare, comprising only 15-20 items out of a total of more than 20,000 pieces of freight handled daily by ODFL. [Stephany, Day 1, 29-30].

2.    As required by ODFL, Goldsmith provided his photographic driver's license, identifying him by name and date of birth. [Ex. 4]. Goldsmith presented the crate to ODFL with a bill of lading. [Ex. 2].

3.    At the time of the shipment, Goldsmith had two previous drug distribution convictions: (1) 1991 conviction in Chicago for possession of marijuana with intent to distribute; and (2) 2001 conviction in Los Angeles for possession of marijuana for sale and conspiracy.  However, in a record check made by Ferrell on May 16th

he learned only that Goldsmith had been charged in the 2001 case;
he did not learn of the disposition of that case. [Ex. 11, p. 3].

4.   The bill of lading identified the shipper as "Underwater
Equipment Sales," with an address of "317 Catalina Ct, Pt. Loma,
CA." It identified two phone numbers associated with the shipper.
Underwater Equipment Sales does not exist.  317 Catalina Ct, Pt.
Loma is not a real address. [Ferrell, Day 1, 126-127].

5.   The bill of lading identified the consignee/receiver as
"DVP Diving & Video," with an address of "33 Silva Lane, Dracut,
MA." It identified one phone number associated with the consignee.
DVP Diving & Video does not exist.  33 Silva Lane, Dracut, MA, is
not the address of the consignee; it is the address of the ODFL
service center in Dracut. [Ferrell, Day 1, 127].

6.   The bill of lading described the article(s) to be shipped
as "wooden crate w/test equipment," weighing 600 pounds.  The crate
did not contain test equipment, it contained approximately 200
pounds of marijuana, wrapped in duct tape, and placed within four
large hard plastic cases. [Hersey, Day 2, 47-48, 52].

7.   Goldsmith was not the shipper of the crate, he merely
delivered the crate to ODFL.  His name does not appear on the bill
of lading as the shipper, and he did not sign his name on the bill
of lading as the authorized representative of the shipper of the
crate.  The authorized shipper signature on the bill of lading is
"fnu Cleary."  However, because Goldsmith claims to have "mailed"

the crate [Aff. of Goldsmith, ¶1], and co-conspirator John Gillies ("Gillies") claims that Goldsmith sent the crate from California to Massachusetts [Aff. of Gillies, ¶3], it fairly can be inferred that Goldsmith signed a false name on the bill of lading as the authorized signature for the shipper. The signature of the shipper on the bill of lading is, according to the face of the document, a certification that the article to be shipped is properly described.

8.    Freight charges for the crate were not pre-paid. The crate was sent collect, with freight charges to be paid by the consignee. ODFL considers collect shipments to be "cash transactions." [Ex. 2; Stephany, Day 1, 40, 26].

9.    The crate was sent as a "will-call" item, to be held at ODFL's Dracut facility for pick-up by the consignee. "Will-calls," as opposed to local deliveries by ODFL, are rare, comprising only 15-20 items out of a total of more than 20,000 pieces of freight handled daily by ODFL. [Stephany, Day 1, 29].

10.    Goldsmith was not the owner of the marijuana, and has not claimed to be so. Gillies owned the marijuana, having supplied the money for its purchase. [Aff. of John Gillies, ¶2].

11.    After the crate was searched in North Carolina under a warrant issued by a Superior Court Judge of that state, Boston DEA Agent Kevin Hersey ("Hersey") arranged for a controlled delivery of the crate at ODFL's Dracut service center. [Hersey, Day 2, 19].

12.    An attempted controlled delivery of the crate on Friday

24

May 23rd was not successful. [Hersey, Day 2, 54]. The next business day, Tuesday, May 27th, Gillies appeared at ODFL in Dracut with the shipper's original copy of the bill of lading in hand. He provided an undercover officer, acting as an ODFL employee, with the bill of lading, paid the outstanding freight charges of $359.02 in cash, and unsuccessfully tried to fit the crate into the vehicle he brought. [Hersey, Day 2, 20-26]. He also provided the undercover officer a New York State photographic driver's license to support his identity. The driver's license contained Gillies' photograph, but was in the name "Robert Burgess." [Ex. 16]. Gillies also signed the delivery receipt in the name "Robert Burgess." [Ex. 7; Hersey, Day 2, 25].

13. On May 28th, Gillies returned to ODFL in Dracut and succeeded in taking possession of the crate, with its marijuana contents. He drove the crate to a self-storage facility in Canton, MA, collecting co-conspirators Ben Silver and John Ryan on route. [Hersey, Day 2, 27-29]. Gillies had previously rented a unit (No. 418) at the storage company in the name of David Martino. He had used a Massachusetts driver's license in that name which contained his photograph. [Ex. 18].

14. When the crate was shipped from California, it had stapled to its exterior a number of notices identifying the shipment as consigned to DVP Diving & Video, as a will-call pick-up, and providing a contact name, "C Long," and contact phone

number. [Ex. 12].  C. Long is a name used by co-conspirator Ben Silver.  When Silver was arrested on May 28th, he had on or about his person a photographic Vermont identification document containing his photograph, but in the name of Matthew C. Long. [Ex. 17].

**B.  Requested Rulings of Law (Standing Issue Only)**

1.  A wrapped parcel delivered to a private freight carrier is an "effect" within the meaning of the Fourth Amendment. Jacobsen, 466 U.S. at 114; LaFrance, 879 F.2d at 4.

2.  "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." Jacobsen, 466 U.S. at 113.

3.  Whether an individual can claim that a search infringed his Fourth Amendment rights is determined by whether "it infringe[d] an expectation of privacy [of the individual] that society is prepared to consider reasonable." Jacobsen, 466 U.S. at 122.

4.  It is Goldsmith's burden to show that he had a legitimate expectation of privacy in the item searched.  Rawlings v. Kentucky, 488 U.S. 98, 104 (1980); United States v. Lewis, 40 F.3d 1325, 1333 (1st Cir. 1994).

5.  Goldsmith had a subjective expectation of privacy in the crate.  However, "[t]he concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very

nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." <u>Jacobsen</u>, 466 U.S. at 122. "[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered." <u>Jacobsen</u>, 466 U.S. at 122, n. 22 (*quoting* <u>Rakas</u>, 439 U.S. at 143-144, n. 12). "An expectation of privacy does not give rise to Fourth Amendment protection, however, unless society is prepared to accept that expectation as objectively reasonable." <u>California v. Greenwood</u>, 486 U.S. 35, 39-40 (1988). <u>See also</u> <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 338 (1985) (*quoting* <u>Hudson v. Palmer</u>, 468 U.S. at 526)(an expectation of privacy must be one that society is "prepared to recognize as legitimate.").

6.    "No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant." <u>Oliver v. United States</u>, 466 U.S. 170, 177 (1984). Goldsmith took or relied on certain steps of others to protect the privacy of the contents of the crate, such as wrapping the marijuana in duct tape, placing it in hard plastic cases, and using a strong, secure outer crate. However, "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment."

<u>California v. Ciarolo</u>, 476 U.S. 207, 212 (1986) (*quoting* <u>Oliver</u>, 466 U.S. at 182-83 (rejecting suggestion that steps taken to protect privacy establish expectations of privacy as legitimate).

7.    Ownership of the marijuana is one fact to be considered in establishing a legitimate claim to the protections of the Fourth Amendment.    <u>Rawlings</u>, 448 U.S. at 105.    Goldsmith has not and cannot make a claim of ownership of the marijuana.

8.    The right to exclude others is also a fact to be considered in establishing a legitimate claim to the protections of the Fourth Amendment.    <u>Rakas</u>, 439 U.S. at 149 ("one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude").    Here, where Goldsmith is not the owner of the contents of the crate, not identified as the shipper or the consignee, did not sign as shipper, and both the shipper and consignee are fictitious, only physical possession of the bill of lading establishes a right to control and possess the crate and a right to exclude others from that possession.    Goldsmith relinquished his right to exclude others from the crate by providing the original customer's copy of the bill of lading to another, that is, Gillies.

9.    The legitimacy of Goldsmith's subjective expectation of privacy must be evaluated without regard to the contraband contained in the crate.    <u>LaFrance</u>, 879 F.2d at 7 (*citing* <u>Jacobsen</u>, 466 U.S. at 114).    However, Goldsmith "has no legitimate

28

expectation of privacy in information he voluntarily turns over to third parties." Smith v. Maryland, 443 U.S. 735, 743-44 (1979). Just like the defendant in Smith who voluntarily exposed to the phone company the numbers he dialed, Goldsmith voluntarily exposed to ODFL the false information on the bill of lading and assumed the risk that ODFL would convey it to law enforcement. Thus, although this Court cannot consider the contents of the crate in evaluating Goldsmith's privacy interests, it can consider all other information provided to ODFL, including: (1) fictitious shipper name; (2) fictitious shipper address; (3) fictitious shipper signature; (4) fictitious consignee; (5) false consignee address; (6) false description of article; (7) false certification of shipment description; (8) false identification of Gillies to take possession of crate on behalf of consignee; (9) cash payment of freight charges. Although this Court must ignore the fact that the crate contained marijuana, it need not ignore, in evaluating whether society is prepared to accept Goldsmith's privacy claim as legitimate, that the shipment fits a drug trafficking profile, including secure packaging, fictitious shipper and consignee, delivery to dock by a twice convicted drug dealer, will-call pick-up, cash payment, and false identification of consignee upon pick-up.

10. "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to

concepts of real or personal property law or to understandings that are recognized and permitted by society." Rakas, 439 U.S. at 143, n. 12. Here, Goldsmith is not the owner of the contents of the crate, did not identify himself as the shipper, and he gave up the right to possess the crate and to exclude others from its contents. Moreover, common law undercuts any claim that his subjective expectation of privacy is reasonable or legitimate. "Common carriers have a common law right to inspect packages they accept for shipment, based on their duty to refrain from carrying contraband." Illinois v. Andreas, 463 U.S. 765, 769, n. 1 (1983). See also United States v. Pryba, 502 F.2d 391, 399-400 (D.C. Cir. 1974) ("the frustration of criminality is likewise a worthy carrier endeavor," permitting inquiry as to contents of a shipment or a reasonable inspection); United States v. Edwards, 602 F.2d 458, 463 (1st Cir. 1979) (same). Here, where Goldsmith delivered a crate for shipment that immediately aroused the suspicions of ODFL's head of security, Goldsmith's expectation of privacy can hardly be found to be objectively reasonable. See Pryba, 502 F.2d at 400 (clerk's "understandable suspicion that box contained contraband that prompted [supervisor's] decision to inspect it"). Although ODFL did not search the crate, they could legally have done so based on their reasonable suspicions, and that greatly diminishes the objective reasonableness of Goldsmith's expectation of privacy.

11. "Determining whether an expectation of privacy is

'legitimate' or 'reasonable' necessarily entails a balancing of interests." Hudson, 468 U.S. at 527. In Hudson, the governmental interest was the interest of society in the security of its penal institutions. In Terry, 392 U.S. at 22, the governmental interests supporting the initial seizure of the person were "effective crime prevention and detection." Here, it is the compelling interest of society in combating interstate drug commerce. See Place, 462 U.S. at 703 (*citing and quoting* United States v. Mendenhall, 446 U.S. 544, 561 (1980) (opinion of Powell, J.)).

12. This Court should find that society is not prepared to recognize Goldsmith's subjective expectation of privacy as legitimate where he is not the owner of the article shipped; he is not the shipper or consignee, he merely delivered the shipment to ODFL; he did not sign the bill of lading as shipper under his own name; he signed a false name on the bill of lading as shipper; the shipper and consignee on the bill of lading are fictitious; the certified description of the article shipped is false; his means of shipping was so suspicious that they immediately aroused the reasonable suspicions of ODFL, who had a common law right to inspect the suspicious package; and he relinquished any right he had to take possession of or exclude others from the shipment by giving the bill of lading to another.

13. As Goldsmith lacks a legitimate, objectively reasonable expectation of privacy in the crate, he cannot contest the search

that led to the discovery of the marijuana, and his motion to suppress must be denied.

### C.  Discussion In Support of Rulings of Law

The government is not asking this Court to recognize a general governmental right to inspect with impunity sealed packages entrusted to common carriers.  The "standing" issue before the Court is very narrow.  The government is only asking this Court to refuse to recognize Goldsmith's right to contest the search of the crate on the basis of the very fact-intensive record before the Court.  That record establishes a shipment that so clearly met a contraband profile for interstate shipments that ODFL made an immediate referral of the shipment to law enforcement.  Further investigation, while the crate was still in ODFL's legitimate possession, produced probable cause that the crate contained controlled substances.  The legal document under which the crate was shipped, the bill of lading, contained nothing by false and fictitious information.  Goldsmith's only public association with the shipment was his delivery of the crate to ODFL.  He even gave up possession of the bill of lading, and thereby, the right to control and possess the crate, and the right to exclude others.  Goldsmith was not a novice in the drug dealing business.  He did not declare himself as the shipper of the crate, and he did not sign his own name as the shipper.  He wanted the advantage of "plausible deniability" if the contraband in the crate was

discovered.  Without additional evidence, the mere delivery of contraband in a sealed package will not generally support a criminal prosecution.[7]  There is a significant difference between declaring oneself as the shipper, and thereby imputing to oneself knowledge of the shipment, and merely delivering a sealed crate to a common carrier, and thereby maintaining the ability to deny all knowledge of the contents of the shipment.  Goldsmith chose to do the latter, distancing and disassociating himself from the unlawful contents of the crate.  After having done so, he should not now have his subjective privacy interest in the crate recognized as legitimate.

This Court should ask itself whether, if Goldsmith cannot contest the search of the crate, would the protections afforded all citizens by the Fourth Amendment be eroded in a way society is not willing to accept.  See Ciarolo, 476 U.S. at 212 (*quoting* Oliver, 466 U.S. at 182-83 (test is whether "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.").  The answer should be in the negative. Society should not care if a sealed crate shipped by someone who uses a fictitious shipper's name, a fictitious shipper's address, a fictitious shipper's signature, a fictitious recipient's name, a

---

[7]Goldsmith is a defendant in this case only because investigation after the controlled delivery, specifically the cooperation of co-conspirator John Ryan, provided the additional evidence needed to seek and obtain an indictment.

false recipient's address, a false description of the contents of the crate, and a false certification of contents, is opened by the government. Society should not care because it is unlikely in the extreme that any shipment with all of those characteristics is a legitimate and lawful use of our interstate shipping system, and society has no interest in protecting purely unlawful conduct. See Jacobsen, 466 U.S. at 122, n. 22 (burglar plying his trade in off-season cabin expects privacy, but it is not one that the law recognizes as legitimate because his presence is wrongful). Here, Goldsmith's use of the interstate trucking system, based on his own manner and means of shipping the crate, was so obviously wrongful that this Court should conclude that society is not prepared to accept his expectation of privacy as legitimate.

The parties have both previously briefed the "expectation of privacy" issue, and the government will not herein repeat a discussion of the fictitious sender/addressee cases. The cases, which come out both ways, are not necessarily reconcilable. Among those favoring the government's argument in this case are United States v. Smith, 39 F.3d 1143, 1145 (11th Cir. 1994); United States v. Givens, 733 F.2d 339, 341-42 (4th Cir, 1984); United States v. Walker, 20 F. Supp. 2d 971, 974 (S.D. W.Va. 1998); United States v. DiMaggio, 744 F. Supp. 43, 46 (N.D.N.Y. 1990). But none of those cases, and none cited by Goldsmith, bind this Court. Most seem to find an expectation of privacy to be legitimate or not legitimate

without any real analysis.  The government in its request for rulings above has tried to put flesh on the concept of a "legitimate expectation of privacy" by a discussion of such factors as ownership, the right to exclude others, common law right of inspection, the drug trafficking profile established by information learned from the bill of lading, and the governmental interests involved.  Based on the extensive factual record developed at the evidentiary hearing, and the arguments advanced above, the government asks this Court to find that society is not prepared to recognize Goldsmith's expectation of privacy as legitimate, that is, as objectively reasonable.  Accordingly, the government asks this Court to deny Goldsmith the right to contest the merits of the search of the crate on that basis.

## III. **THE SEARCH OF THE CRATE**

### A.    **Requested Findings of Fact**

1.    At 9:19 am on May 21st, a Superior Court Judge of the State of North Carolina issued a search warrant authorizing the search of the crate, to be executed "when the crate arrives on the docks of Old Dominion Freight Lines terminal located at 4715 Evans Town Road, Greensboro, NC." [Ex. 11].

2.    The affidavit submitted in support of the search warrant (the "affidavit") was signed by TFO Ferrell.  In 2003, TFO Ferrell was an experienced drug investigator assigned to the DEA regional interdiction task force in Greensboro, and had about 13 years of

police experience investigating the unlawful distribution of controlled substances. [Ferrell, Day 1, 117-120; Ex. 11, p. 4].

3.    The affidavit asserted that the crate was being shipped by ODFL from Point Loma, CA to Dracut, MA, and that it would be at ODFL in Greensboro on May 21st. The affidavit did not disclose that the crate was en route to Greensboro at the direction of TFO Ferrell, but ODFL does not commit to a particular route and never provides shippers information about the particular route that a shipment will take, leaving route selection totally within its discretion. [Stephany, Day 1, 50].

4.    The face sheet of the application for search warrant requested that the Court issue a warrant to search the crate for various unlawful controlled substances and evidence of drug distribution, and asserted that such items constitute evidence of a crime and the identity of a person participating in a crime, namely, violations of the North Carolina Controlled Substances Act, G.S. 90-95. [Ex. 11].

5.    The affidavit itself twice asserted that probable cause exists to believe that contraband, i.e. certain named controlled substances, would be inside the crate. [Ex. 11, pp. 4, 5].

6.    The affidavit asserted the following facts in support of probable cause that evidence of a crime or contraband would be inside the crate: (1) the crate was dropped at ODFL's California trucking terminal; (2) freight charges were pre-paid in cash; (3)

the crate was shipped as a will-call, or dock pick-up, at ODFL's terminal in Dracut; (4) the crate was shipped from California by Joshua Goldsmith who, according to a criminal record check, had a 1991 conviction for possession with intent to distribute marijuana and a 2001 arrest for possessing marijuana for sale and conspiracy to commit a crime; (5) a phone number provided on the bill of lading was associated in a DEA database with an individual suspected in distribution of a variety of controlled substances; (6) a local law enforcement officer in Point Loma, California, reported that the address on the bill of lading for the shipper did not exist, and he could find no business under the name given for the shipper; (7) a local law enforcement officer in Dracut, MA reported that there was no business by the name of the consignee in the area; (8) the address used for the consignee was ODFL's trucking terminal.

    7.    The affidavit also established the extensive experience of TFO Ferrell as a drug investigator, and contained his assertion that he has found the use of dock delivery and will-call pick-up "to be used by illegal narcotics smugglers to avoid law enforcement detection of their residences and location." [Ex. 11, p. 4].

    8.    The only fact supporting probable cause that was established as inaccurate at the evidentiary hearing was the form of payment for the shipment of the crate. It was shipped collect, and freight charges were not pre-paid in cash. [Ex. 2]. From

ODFL's perspective, a collect shipment is considered a cash transaction. [Stephany, Day 1, 109].

**B.    Requested Rulings of Law**

1.    It is not necessary for this Court to determine if, given the diversion of the crate into North Carolina at the direction of law enforcement, probable cause exists to conclude that the controlled substances believed to be in the crate would constitute evidence of a violation of North Carolina drugs laws.

2.    "Probable cause exists where information in the affidavit reveals 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Baldyga, 233 F.3d 674, 683 (1st Cir. 2000) (quoting United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997). North Carolina law is to the same effect.  See State v. Colvin, 92 N.C. App. 152, 158 (N.C. App. Ct. 1988) (citing Gates v. Illinois, 462 U.S. 213 (1983) ("A warrant is properly issued if the affidavit discloses sufficient information for a reviewing magistrate to determine practically and with common sense that there is a fair probability contraband or evidence of a crime will be found in a particular place."). Ferrell's affidavit reveals a fair probability that contraband, that is, unlawful controlled substances, will be found in the crate.  That is the case even if the inaccurate statement about cash pre-payment of freight charges is ignored.

3.    North Carolina law provides that "an item is subject to

seizure pursuant to a search warrant if there is probable cause to believe that it: . . (2) is contraband or otherwise unlawfully possessed; or . . . (4) constitutes evidence of an offense or the identity of a person participating in an offense." C.G.S.A. §15A-242. Ferrell's affidavit complies with the North Carolina statute, as it reveals a fair probability that contraband, that is, unlawful controlled substances, will be found in the crate.  That is the case even if the inaccurate statement about cash pre-payment of freight charges is ignored.

4.   North Carolina law provides that "a search warrant valid throughout the state may be issued by: . . . (3) a judge of the superior court."  N.C.G.S.A. §15A-243.  A judge of the superior court meets the constitutional requirements that the issuing official be: (1) neutral and detached;  and (2) capable of determining whether probable cause exists for the requested search. Shadwick v. City of Tampa, 407 U.S. 345, 350 (1972).

5.   North Carolina law provides that "All applications [for a search warrant] must contain: . . . (2) A statement that there is probable cause to believe that items subject to seizure under G.S. 15A-242 may be found in or upon a designated or described place, vehicle or person; and (3) Allegations of fact supporting the statement. The statements must be supported by one or more affidavits particularly setting forth the facts and circumstances establishing probable cause to believe that the items are in the

places or in the possession of the individuals to be searched."
N.C.G.S.A. §15A-244.  The application contained a statement that
there is probable cause to believe that contraband, subject to
seizure under G.S. 15A-242, might be found in the crate.  Ferrell's
affidavit set forth facts and circumstances establishing probable
cause to believe that contraband, subject to seizure under G.S.
§15A-242, was in the place to be searched, that is, the crate.

6.    Ferrell did include in his affidavit the fact that the
crate was being shipped across the country from California to
Massachusetts, and that it would arrive in Greensboro sometime on
May 21st, which were accurate statements.  He did not include in his
affidavit that he had directed ODFL to divert the crate to
Greensboro, and that it would not otherwise have been in North
Carolina.  Under Franks v. Delaware, 438 U.S. 154 (1978) and its
progeny, "a court faced with a warrant affidavit which includes
deliberately or reckless false statements must set aside those
false statements and determine whether the remaining information in
the affidavit sets forth sufficient facts to support a finding of
probable cause."  United States v. Dessesaure, No. 04-2170, *slip
op*., at 12 (1st Cir. November 30, 2005).  "With an omission, the
inquiry is whether its inclusion in an affidavit would have led to
a negative finding by the magistrate on probable cause."  United
States v. Castillo, 287 F.3d 21, 25, n.4 (1st Cir. 2002).

7.    Ferrell did not intentionally omit the diversion of the

40

crate for the affidavit in order to deceive the judge, or to obtain a search warrant to which he knew he was not entitled. [Ferrell. Day 1, 203-204]. Ferrell believed that the contents of the crate were constructively possessed by Goldsmith, and perhaps others, in every jurisdiction through which the crate traveled. [Ferrell, Day 1, 201-202]. Nor did he omit the diversion of the crate in reckless disregard of the significance of the diversion. The significance of the diversion is a complicated and difficult legal issue, as this suppression motion establishes. Ferrell's failure to recognize the significance, if any, of the diversion, in the context of a fast-moving drug investigation, where the effectiveness of any possible controlled delivery requires being able to meet the conspirators' expectations of a timely delivery, should not be found to be in reckless disregard of the significance of the diversion.

8. Even if Ferrell's omission was intentional or reckless, disclosing the diversion in the affidavit would not have led to a negative finding on probable cause. See Forman v. Richmond Police Dep't., 104 F.3d 950, 964 (7th Cir. 1997) (immaterial misstatements will not invalidate otherwise legitimate warrant). First, even if the diversion calls into question the applicability of North Carolina criminal laws, it does not call into question the authority of the North Carolina judge to authorize a search for contraband located within its borders. Even if there was no

probable cause to support a violation of North Carolina laws
because of the diversion, there was ample probable cause to believe
the crate contained contraband, that is controlled substances,
within the borders of North Carolina.  Knowledge of the diversion
would not have affected that determination.  Contraband is a fairly
universal concept, and controlled substances in North Carolina are
contraband whether or not North Carolina can charge someone with
their possession.  Second, and in any event, it is for this Court,
and not the judge considering the search warrant application, to
assess the significance of the diversion to the admissibility of
the marijuana in this case.  See United States v. Edwards, 443 F.
Supp. 192, 197 (D. Mass. 1977) (Tauro, J.) *aff'd* 602 F.2d 458, 466
(1st Cir. 1979) ("function [of issuing magistrate] is to determine
whether the government has presented sufficient evidence to
establish probable cause for issuance of warrant.  His job is not
to decide whether the evidence was obtained by constitutional
means.").  At most, the diversion raises a suppression issue, and
not a probable cause issue.  Suppression issues are for this Court,
and not for the official issuing the search warrant.

 C.  **Discussion of Requested Rulings of Law**

 1.  **Probable cause to believe controlled substances
 were in the crate**

Although there are other issues to address, this Court should
first answer this question: does Ferrell's affidavit, ignoring the
inaccurate assertion about a cash pre-payment of freight charges,

42

establish probable cause to believe that controlled substances will be found in the crate?  The answer should be in the affirmative.

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983).  "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)); see also United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996) (normally a reviewing court will defer to an issuing magistrate judge's probable cause determination in a doubtful or marginal case).  "A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." Gates, 462 U.S. at 236 (quoting United States v. Ventresca, 380 U.S. 102, 109 (1965)).

In addition to the facts listed in the factual findings section above, the affidavit in support of the search warrant application in this case informed the issuing state court judge that Ferrell had 13 years experience as a narcotics investigator,

and involvement in over 500 cases involving the sale and delivery
of illegal controlled substances.   Accordingly, the words of the
First Circuit in <u>United States v. Soule</u>, 908 F.2d 1032, 1040 (1st
Cir. 1990), are equally applicable here:

> Finally, the affidavit was prepared by a police officer
> whose experience and expertise provided the clerk
> magistrate with further reason to credit the
> representation in the warrant application that marijuana
> would be found at 255 Broadway.  <u>See</u>, <u>e.g.</u>, <u>United States
> v. Ortiz</u>, 422 U.S. 891, 897 (1975); <u>Grimaldi v. United
> States</u>, 606 F.2d 332, 337 (1st Cir. 1979); <u>United States
> v. Fannin</u>, 817 F.2d 1379, 1382 (9th Cir. 1987)
> ("magistrate may rely on the conclusions of experienced
> law enforcement officers regarding where evidence of a
> crime is likely to be found").   Moreover, to an
> experience police officer possessed of the other
> information recited in the Hayes affidavit, the facially
> innocent act of driving the pick-up truck around to the
> back door of the barn, at the rear of the residence,
> rather than to the front door of the barn, would take on
> telling significance as to the type of cargo about to be
> unloaded.

Here, delivery to dock and will-call pick-up might mean nothing to
a non-law enforcement officer, but those facts had a significant
meaning to Ferrell, and the state court judge was entitled to take
Ferrell's experience into consideration.

The First Circuit's words in <u>United States v. Taylor</u>, 985 F.2d
3 (1st Cir. 1993), are also equally applicable here, where one part
of the probable cause showing was the information learned by the
affiant about Goldsmith's drug-related criminal history:   "An
affiant's knowledge of the target's prior criminal activity or
record clearly is material to the probable cause determination."

Even ignoring the inaccurate assertion about a cash pre-

payment of freight charges, this Court should find that the affidavit provided the state court judge with a substantial basis to conclude that there was probable cause that controlled substances would be found in the crate.

> **2. The legal effect of the diversion on the applicability of North Carolina drug laws to the contents of the crate does not require suppression of the marijuana by this Court**

The question of whether North Carolina could prosecute Goldsmith or any other individual for violations of its drug laws based on the contents of the crate need not be decided by this Court in the context of the <u>Franks</u> issue raised by the omission of the diversion facts from the search warrant affidavit. The state court judge's knowledge of the diversion would not have led to a negative finding of probable cause, a prerequisite to suppression under <u>Franks v. Delaware</u>, <u>supra</u>. Moreover, even if North Carolina drug laws could not be enforced against Goldsmith or others based on the contents of the crate, Goldsmith's suppression motion must by denied by this Court.

> **a. The affidavit establishes probable cause that contraband is in the crate, whether or not it establishes probable cause that evidence of drug law violation is in the crate**

Even if this Court finds an intentional or reckless omission under <u>Franks</u> regarding the government directed diversion of the crate, it should find that the omission would not have led to a negative finding by the issuing judge on probable cause. That is

45

the case even if the diversion precludes prosecution for a violation of North Carolina state drug laws, because the affidavit easily establishes probable cause to believe that the crate contained contraband.  The constitution and the laws of North Carolina permit issuance of search warrants based on probable cause to believe contraband will be found on the premises/place to be searched.  In his affidavit, Ferrell twice stated that he believed probable cause existed to conclude that contraband, that is, controlled substances, would be found in the crate, both times without reference to state law drug violations. [Ex. 11, pp. 4, 5]. Even though the application references probable cause to believe evidence of a North Carolina drug law violation will be found in the crate, Goldsmith is not harmed in any constitutional sense by upholding the warrant based on the alternative and permissible probable cause showing that contraband would be in the crate.[8]  The warrant, as required by the constitution described the items to be searched for, the place to be searched, and probable cause to

---

[8]Even if North Carolina had no legitimate interest in enforcing its drug laws against those who possessed the marijuana in the crate, North Carolina did have a legitimate interest in seizing contraband that was being transported by a North Carolina corporation, even if the crate was in North Carolina only at the direction of law enforcement.  ODFL is headquartered in Thomasville, NC, has its national head of security at that location, has a large break bulk service center in Greensboro, and makes regular, conscientious efforts to keep its national trucking system free of unlawful contraband.  Even if North Carolina could not use its own drug laws, it had a legitimate interest in the investigation of contraband flowing through ODFL's system.

believe that the specified items of contraband would be found.
Nothing more is required. As the Supreme Court has said: "courts
should not invalidate . . . warrant[s] by interpreting affidavit[s]
in a hypertechnical, rather than a commonsense, manner."
Ventresca, 380 U.S. at 109; see also Gates, 462 U.S. at 235. The
Supreme Court has also "recognized that affidavits 'are normally
drafted by nonlawyers in the midst and haste of a criminal
investigation. Technical requirements of elaborate specificity
once exacted under common law pleading have no proper place in this
area.'" Gates, 462 U.S. at 235 (quoting Ventresca, 380 U.S. at
108).

> b. The diversion facts do not negate probable
> cause; they merely raise suppression issues
> for this Court, and not the issuing judge, to
> decide

Moreover, the diversion facts would not have led to a negative
finding on probable cause because the diversion facts do not the
negate probable cause that otherwise existed to believe that
evidence of a violation of North Carolina drug laws (or contraband)
would be found in the crate. At most, the diversion facts provide
a basis for a suppression motion before this Court. It would not
have been for the judge issuing the search warrant to predict the
legal effect, if any, of the diversion from the face of an
application for a search warrant. Search warrants are often issued
based on facts that are later claimed to have tainted the search.
It is simply not practical, or required, that a search warrant not

issue based on potential legal issues that might support a suppression motion. For instance, if a search warrant affidavit contains information about a statement obtained in circumstances implicating <u>Miranda</u> rights, or it contains information about items observed by a law enforcement officer in circumstances that raise questions about the officer's lawful right to make the observations, it is not the role of the issuing official to question whether the information comes from a constitutional or lawful source, or to refuse to issue the warrant, unless of course probable cause is otherwise lacking. Issues such as the legality of information contained in a search warrant affidavit are issues that must be framed by a suppression motion and presented only in the adversarial context of a criminal prosecution. <u>See</u> Fed. R. Crim. P. 41(h) ("A defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides). Here, even if the diversion facts were known to the issuing judge it would not have been for the judge to refuse to issue the warrant because of the legal objections that might someday be raised by a criminal defendant based on the diversion.[9] In this case, such a premature

_____

[9]Both federal and North Carolina law <u>require</u> that a search warrant issue upon a showing of probable cause to search for and seize property subject to seizure. Rule 41(d)(1) states that the issuing official "must issue the warrant if there is probable cause to search for and seize a person or property under Rule 41(c)." N.C.G.S.A. §15A-245 provides: "If the issuing official finds that the application meets the requirements of this Article and finds there is probable cause to believe that the search will discover items specified in the application which are subject to seizure

decision would have circumvented the issue of "standing" for all conspirators, without any determination that a particular individual could show an infringement of a legitimate expectation of privacy. Here, probable cause to believe that the crate contained evidence of a North Carolina drug crime (as well as contraband) was established by the affidavit, and the diversion facts would not have led to a negative finding on probable cause.

        c.   Even if North Carolina drug laws could not be enforced against Goldsmith or others based on the contents of the crate, probable cause still existed to justify the search, and even if it did not, the <u>Leon</u> good-faith exception of the exclusionary rule should be applied

This suppression motion is the proper vehicle to contest the diversion of the crate, and Goldsmith has done so. However, if this Court reaches the merits of Goldsmith's challenge to the search of the crate, it should deny the motion on the basis, as argued above, that at a minimum, the search warrant affidavit established probable cause to believe that contraband, that is, unlawful controlled substances, would be found in the crate.

Additionally, if the omission of the diversion facts from the affidavit was not intentional or reckless, as argued by the government, the marijuana should not be suppressed even if this Court determines probable cause to be lacking. "In <u>United States v. Leon</u>, the Supreme Court held that even in the absence of

_____

under G.S. 15A-242, he must issue a search warrant in accordance with the requirements of this Article."

49

probable cause, the exclusionary rule should apply only where excluding evidence would have a substantial deterrent effect on the police." United States v. Vigeant, 176 F.3d 565, 571 (1st Cir. 1999). Where officers have relied in good faith on a subsequently invalidated search warrant, "[t]he Court concluded that the purpose of the rule only rarely would be served by applying it in such circumstances." United States v. Fuccillo, 808 F.2d 173, 177 (1st Cir. 1987).

The Supreme Court in Leon made clear its expectation that in search warrant cases where warrants are subsequently invalidated the Leon good-faith exception would be the rule and would normally avert suppression. It noted:

> "Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness," Illinois v. Gates, 462 U.S. at 267 (White, J. concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." United States v. Ross, 456 U.S. 798, 823, n. 32 (1982).

United States v. Leon, 468 U.S. 987, 922 (1984). The Court also stated: "We . . . conclude that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Id. at 918.

However, the Court also made clear that an officer's reliance on the magistrate's probable cause determination "must be objectively reasonable." Leon, 468 U.S. at 922. The Court went

further and listed those instances in which suppression would remain an appropriate remedy: (1) if the magistrate judge was misled by information in an affidavit that the affiant knew was false or was in reckless disregard of its truthfulness; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in <u>Lo-Ji Sales, Inc. v. New York</u>, 442 U.S. 319 (1979); (3) where the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant is so facially deficient  -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid.  <u>Leon</u>, 468 U.S. at 923; <u>see also</u> <u>United States v. Owens</u>, 167 F.3d 739, 745 (1st Cir. 1999). Here, if this Court determines that Ferrell did not intentionally or recklessly mislead the issuing judge by omitting the diversion facts, it should also find that the probable cause question is close, and the warrant is not facially deficient.  In that case, the <u>Leon</u> good-faith exception to the exclusionary rule is applicable, even if this Court finds an absence of probable cause.

## IV.  <u>SUMMARY</u>

To summarize the many various issues addressed above, this Court should find that Goldsmith lacks "standing" to contest both the diversion and the search of the crate.  To the degree Goldsmith has "standing" to contest the seizure (i.e., the diversion), the

diversion was reasonable under all the circumstances, and in any event, the attenuation and independent source doctrines preclude suppression of the marijuana on the bases of the diversion.  To the degree Goldsmith has "standing" to contest the search, his motion should be denied because the search warrant affidavit establishes probable cause to believe evidence of a crime and contraband would be found in the crate, and at a minimum establishes probable cause that contraband would be found in the crate; suppression under <u>Franks</u> is not called for because inclusion of the diversion facts in the affidavit would not have led to a negative finding of probable cause; and even if probable cause is lacking, because no omission was intentionally or recklessly made, the probable cause question is close, and the warrant was not facially deficient, the <u>Leon</u> good-faith exception to the exclusionary rule precludes suppression.

<div style="margin-left:40%">

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: <u>/s/ Timothy Q. Feeley</u>
TIMOTHY Q. FEELEY
Assistant U.S. Attorney
(617) 748-3172

</div>

December 9, 2005

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 9th day of December 2005 served

upon defendants' counsel, Stephen Hrones, a copy of the foregoing
document by electronic filing notice.

<u>/s/ Timothy Q. Feeley</u>
TIMOTHY Q. FEELEY
Assistant U.S. Attorney