UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA    )         Criminal No. 03-10234-MLW
                                        )
v.                                      )
                                        )
JOSHUA GOLDSMITH et al.      )
        Defendant.                   )
_____)

**DEFENDANT JOSHUA GOLDSMITH'S SECOND SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF HIS MOTION TO SUPPRESS EVIDENCE**

Now comes the Defendant, Joshua Goldsmith, and hereby submits this second

supplemental memorandum in support of his motion to suppress evidence.

## FACTS

The Defendant incorporates the facts set forth in his initial and supplemental memoranda

in support of his motion to suppress evidence.  By way of background, this case stems from the

search and seizure of a package allegedly sent by the Defendant from California to Massachusetts

using the freight company Old Dominion.  While en route, the package was diverted to North

Carolina by DEA Task Force Officer Marty Ferrell.  He subsequently applied for a North

Carolina state search warrant, executed it, and discovered a large quantity of marijuana.

Importantly, although the name of the recipient and the return address for the package

was fictitious, the Defendant was the actual sender of the crate and he did provide a valid

identification with his real name and address when he delivered the package to Old Dominion for

shipment.  In addition, he retained the bill of lading so he could track the shipment and insure it

1

was delivered on time and to the appropriate location.  Moreover, he sent a copy of the bill of

lading to co-defendant Gilles so he could retrieve the shipment in Dracut, Massachusetts.

**ARGUMENT**

I.  **THE CONTENTS OF THE PACKAGE SHOULD BE SUPPRESSED BECAUSE THEY WERE DISCOVERED IN VIOLATION OF THE FOURTH AMENDMENT**

A.  **THE DEFENDANT HAS STANDING TO CONTEST THE ISSUE**

In order to have standing[1] to raise a Fourth Amendment violation, the Defendant must

show that he had an expectation of privacy in the contents of the package that society is prepared

to recognize as reasonable.[2]  See Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978).  In

determining whether his expectation is reasonable, this Court must look to "a source outside of

the Fourth Amendment, either...real or personal property law or to understandings that are

recognized and permitted by society."  Id. at 143-44.

It is undisputed that citizens have a legitimate expectation of privacy in their own sealed

letters and packages.  Therefore, government agents may not conduct a search or seizure of such

effects without first obtaining a warrant.  See Ex parte Jackson, 96 U.S. 727 (1878); United

States v. Jacobsen, 466 U.S. 109, 114 (1984).  Accordingly, it follows that the sender of a piece

of mail has a legitimate expectation of privacy even though he was not in physical possession of

the mail while it was en route.  See Matthew Bender & Co., 1-29 Search and Seizure, §29.2

(2004); see also United States v. Van Leeuwen, 397 U.S. 249, 251 (1970) ("Letters and sealed

packages...are as fully guarded from examination and inspection, except as to their outward form

---

[1] Although the term is imprecise, "courts frequently refer to [the] threshold requirement as implicating 'standing.'" United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004).

[2] At oral argument, the government stipulated to the Defendant's subjective expectation of privacy.  (Tr. I, pg. 9).

and weight, as if they were retained by the parties forwarding them in their own domiciles…")
The fact that the package was addressed to a fictitious recipient and had a fraudulent return
address does not change the analysis.

The only circuit court case to directly address the issue of standing for defendants who
use fictitious names for the sender and recipient of a package is United States v. Villarreal, 963
F.2d 770 (5th Cir. 1992).[3]  In Villareal, the police intercepted a parcel containing large drums of
marijuana addressed to, and sent by, a "Roland Martin." Id. at 773.  The officers subsequently
searched it without a warrant and initiated a controlled delivery.  As it turned out, "the
defendants Santos Villarreal and Sergio Gonzalez were the intended recipients of the drums and
Roland Martin was a fictitious name used to ship the drums so that no one could be connected to
the marijuana in case anything went wrong." Id.  Moreover, the defendants did not even pick up
the package from the post office, but rather paid someone to do it for them. Id.  The court ruled
that the defendants did have a reasonable expectation of privacy: "[even though] the consignee of
the drums was technically a fictitious person named Roland Martin, this court has made clear that
individuals may assert a reasonable expectation of privacy in packages addressed to them under
fictitious names." Id. at 774.  In ruling in the defendant's favor, the court cited the fact that
"Villarreal was in possession of the receipt for the drums that bore the name Roland Martin," that
"Villarreal and Gonzales were both the immediate recipients of the drums," and that "they
conspired together to [retrieve] them from the" parcel company. Id.

---

[3] The Defendant has not been able to find any Court of Appeals case which directly addresses the issue of a sender's
standing.  This is perhaps because no sender ever gives valid identification when dropping off a package for
delivery, and is thus rarely detected by law enforcement.  As a result, the Defendant will discuss several cases which
address the issue of fictitious names, but deal with the standing of recipients.

The defendants in <u>Villareal</u> had standing even though they distanced themselves from their package far more than the Defendant in the case at bar.  In <u>Villareal</u>, the names listed as both sender and recipient were fraudulent and the defendants themselves did not even retrieve the package at its destination.  Here the Defendant was the actual sender, gave his real identification when he sent the package, possessed a copy of the bill of lading so he could track the shipment, and sent another copy to the co-defendant so he could retrieve the parcel.  The court in <u>Villareal</u> was simply not concerned that the defendants "used fictitious names in an effort to escape detection" because, as was the case here, "they consistently acted as if they were the ones who were to receive the [package], [and] [t]hey retained possession of the receipt for the [package], which was the only indication of ownership available."  <u>Id</u>. at 775; <u>see also</u> <u>United States</u> v. <u>Richards</u>, 638 F.2d 765, 770 (5th Cir. Mar. 1981) (recipient has expectation of privacy in package addressed to him under an assumed name); <u>United States</u> v. <u>Salemme</u>, 91 F. Supp. 2d 141, 392 (D. Mass. 1999) (Wolf, J.) (that a defendant has "a measure of control and ability to exclude others," supports an argument for standing).

In <u>Walter</u> v. <u>United States</u>, 447 U.S. 649, 654 (1980), the Supreme Court held that a package addressed to a fictitious person at a real address was subject to a Fourth Amendment challenge by the actual recipient.  In that case, the defendant/recipient, Walter, successfully moved to suppress a package of film addressed, not to him, but to "Leggs Inc."  The <u>Walter</u> Court ruled that the FBI had conducted an unreasonable search of the defendant's films, even though…there "was no 'Leggs, Inc' [and] 'Leggs' was the nickname of a woman employed by

4

one of petitioners' companies." Id. at 652 n.1.[4]  It necessarily follows that the Court

concluded the defendants had standing, even though the issue was never directly addressed in the

Court's opinion.[5]

The government's argument[6] that the Defendant did not have a reasonable expectation of

privacy appears to rest solely on the fact that the Defendant used a fraudulent return address

when he sent the package and the recipient's name was fictitious.[7]  It purports to cite several

cases in which defendants could not show reasonable expectations of privacy because the sender

and recipient's names were false.  However, nearly all of the cited cases deal with recipients or

third parties, and in none of those cases did the sender present a valid identification when he

mailed the package, as was the case here.

---

[4] Although, unlike in Walter, the Defendant here was the sender of the package, until the point of delivery he possesses at least the same expectation of privacy as a recipient.  See, e.g., United States v. King, 55 F.3d 1193, 1196 (6th Cir. 1995) (sender's expectation of privacy ordinarily terminates only upon delivery).

[5] Interestingly, the circuit court case reversed by Walter did mention the issue of the defendant's standing.  See United States v. Sanders, 592 F.2d 788, 791 (5th Cir. 1979).  It determined, based on its interpretation of Rakas, 439 U.S. at 140, that the better course was to dispense with a standing analysis and address the legality of the search itself, even though the district court had denied the defendants' motion on standing grounds.  Sanders, 592 F.2d at 791.

[6] Any argument that the Defendant did not have a reasonable expectation of privacy in the package because Old Dominion was legally entitled to open it is wholly without merit.  It is black letter law that the Fourth Amendment is not inapplicable "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official."  Jacobsen, 466 U.S. at 113.  The ability of Old Dominion to open the package, whether because of the vagaries of a commercial shipping compact or because their actions do not implicate the Constitution, should take no part in the consideration of whether the Defendant can challenge the actions of a government agent.  Moreover, the Defendant has never been provided a copy of any model agreement relative to interstate shipping, the agreement is not in evidence in this case, and such an agreement is not the type of evidence that should be subject to judicial notice.

[7] This Court should take judicial notice of the fact that, when "Catalina Court," in zip code "92017" is entered into <http://www.mapquest.com>, it shows that the street does in fact exist, as does "317 Catalina Blvd." in that same zip code.

The first case relied on by the government does not squarely address the relevant issue, but nevertheless contains dicta[8] that actually supports the Defendant's position.  In United States v. Pitts, 322 F.3d 449, 451 (7th Cir. 2003), the defendant was caught shipping drugs through the United States Post Office using fictitious names for both the sender and recipient.  Although the court denied his motion to suppress on abandonment grounds, it specifically held that "there is nothing inherently wrong with a desire to remain anonymous when sending or receiving a package, and thus the expectation of privacy for a person using an alias in sending or receiving mail is one that society is prepared to recognize as reasonable."  Id. at 459 (emphasis added).  As a matter of policy, the court reasoned that denying defendant/senders who use fictitious names the ability to challenge searches and seizures would necessarily result in a loss of Fourth Amendment rights for all those who legally use the mail but wish to remain anonymous.  Id. at 458.

In the next case cited by the government, United States v. Smith, 39 F.3d 1143, 1144 (11th Cir. 1994), the defendant was neither the actual sender, nor the recipient.  In fact, the letter was addressed to a third-party who was supposed to then forward the contents to Smith.  Id. Because of these crucial factual distinctions, that case lends no support to the government's position.  In United States v. Daniel, 982 F.2d 146, 149 (5th Cir. 1993), the court assumed, without deciding, that the defendant/recipient had an expectation of privacy in his package, and

---

[8] "There are a number of legitimate reasons that a person might wish to send or receive a package using a *nom de plume*.  Some authors and journalists, such as the incomparable Ann Landers, whose real name was Eppie Lederer, employ a pseudonym in their professional life…In other situations, a celebrity may wish to avoid harassment or intrusion; a government official may have security concerns in using her real name or home address to receive mail; a business executive in merger talks might worry about potential investors misusing the information gained through the mail to manipulate the securities markets.  Indeed, a sender of mail might wish to remain completely anonymous for any number of reasons…"  Pitts, 322 F.3d 457-58.

6

thus never directly addressed the issue. Rather, the issue turned on the validity of the search. Moreover, to the extent the court discussed the issue in dicta, Daniel is factually different from the case at bar because the Daniel defendant never offered his real identification at any point during the shipping process.

United States v. Pierce, 959 F.2d 1297, 1303 (5th Cir. 1992), is also factually distinguishable from this case because in Pierce the package was addressed to, and picked up by, someone other than the defendant, who was arrested in the getaway car. It is unclear how this case shed any light on the issue now before the court. Likewise, United States v. Koenig, 856 F.2d 843, 846 (7th Cir. 1988), is irrelevant to the case at bar, as the court ruled in Koenig that someone who knocked on a co-defendant's door to buy drugs could not contest the seizure of a package of cocaine which had been recently delivered to that house. The court conceded, however, that the recipient of the package had "a privacy interest in her mail and so may test the legality of the conduct used to search and seize the same." Id.

Similarly, United States v. Givens, 733 F.2d 339 (4th Cir. 1984), is not on point. There the defendants were "claiming a privacy interest in the contents of a package addressed neither to them nor to some entity, real or fictitious, which is their alter ego, but to actual third parties." Givens, 733 F.2d at 341. The court there specifically noted that "[w]hile there is authority for the proposition that…a package addressed [not to a third party, but] to a fictitious entity created by defendants may furnish a basis for a legitimate expectation of privacy…that issue is not before us here and we express no opinion on it." Id. at 341 n.2. Finally, in neither United States v. DiMaggio, 744 F. Supp. 43, 46 (N.D.N.Y. 1990) nor United States v. Zavala, 2003 U.S. Dist. LEXIS 2521 at *4 (E.D. Pa. Feb. 20, 2003), did the defendant/sender present his real

identification to the postal office at the time of mailing.[9]  Thus the Defendant in this case is

entitled to contest the search and seizure of the package because the only relevant case law,

Villareal and Walter, held that defendants do have Fourth Amendment standing in mail seizure

cases even if they use fictitious recipients and fraudulent return addresses.

### B.  AGENT FERRELL SHOULD HAVE OBTAINED A WARRANT BEFORE DIVERTING THE PACKAGE

Since the Defendant had a reasonable expectation of privacy in the contents of the

package, this Court must next address the validity of the initial seizure.  As discussed in the

Defendant's first memorandum, there are several grades of mail seizures, each requiring a

different analysis.  If a government investigator merely observes the outside of a package or lifts

it from a conveyor belt and handles it briefly for inspection, then there is no seizure for Fourth

Amendment purposes, and the government action is subject to no scrutiny at all.  When the

government removes a package from the mail stream and detains it pending further investigation,

then it has conducted a stop subject to constitutional scrutiny.  This kind of partial seizure is

analogous to a so-called "Terry stop" and must be supported by reasonable suspicion.  Jacobsen,

466 U.S. at 120; see also Terry v. Ohio, 392 U.S. 1.  Depending on the length of the detention

and extent of the intrusion, this Terry stop may morph into a seizure requiring probable cause.

See United States v. Sharpe, 470 U.S. 675, 685 (1985).

Finally, there are full-fledged seizures, where the government asserts complete "dominion

and control over the package and its contents." Jacobsen, 466 U.S. at 120.  In those cases,

"[w]here more substantial invasions of constitutionally protected interests are involved, a

---

[9] To the extent these cases are factually on point, their legal holdings directly contradict the Villareal case.  Since Villareal is a circuit court case, this Court should find it more persuasive than the district court cases cited by the government.

warrantless search or seizure is unreasonable in the absence of exigent circumstances.  Id. at 125

n.28.  Here the evidence shows that Agent Ferrell effectuated a "substantial invasion" of the

Defendant's Fourth Amendment interests when he needlessly rerouted the parcel to North

Carolina instead of temporarily holding it in California for further investigation, or seeking a

warrant to search it in either Tennessee or Massachusetts.

      Because Agent Ferrell diverted the package several hundred miles from its planned route,

he removed this case from the category of mail seizures in which the courts have applied the

reasonable suspicion standard.  In nearly every case where the courts have been faced with the

issue of whether a warrantless seizure of mail is lawful, the package in question was detained at

its point of origin.  See, e.g., United States v. Lux, 905 F.2d 1379, 1380 (10th Cir. 1990); United

States v. Gill, 280 F.3d 923, 929 (9th Cir. 2002); United States v. Ganser, 315 F.3d 839, 844 (7th

Cir. 2003).

      The government in the reasonable suspicion cases cited above was not exercising total

dominion and control over the package; it was merely delaying its delivery.  Instead of removing

the package from its rightful course, the government there was merely interjecting itself into the

mail stream.  Here however, instead of allowing an agent in another area to do the investigating

for him, Agent Ferrell chose to make the package come to him.  In doing so, he completely

deprived the sender and recipient of their possessory interests in the parcel, an action which

requires a warrant supported by probable cause.

### C. THE REROUTING WAS UNREASONABLE

#### 1. The police did not have the required level of suspicion

The Defendant contends that, since there were no exigent circumstances, a warrant was required before any diversion. Yet even if Agent Ferrell did not need a warrant to divert the package, at some point in time a detention of mail extends from an investigatory stop to a seizure requiring probable cause. See Sharpe, 470 U.S. at 685. To determine if probable cause is required, a court must decide whether law enforcement detained the parcel for an unreasonably long period of time. United States v. Evans, 282 F.3d 451, 455 (7th Cir. 2002); see also United States v. Place, 462 U.S. 696, 703 (1983) (only "[w]hen the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, [may] the opposing law enforcement interests…support a seizure based on less than probable cause.")

However, in determining what level of suspicion is required in this case, it is important to understand the rationale behind the Terry rule and its extension to mailed items in Van Leeuwen. That nearly all mail detention cases focus on reasonableness should not obscure the fact that the exceptions to the Fourth Amendment outlined in Terry and Van Leeuwen are essentially exigent circumstances. See Van Leeuwen, 397 U.S. at 253 ("Detention for this limited time was, indeed, the prudent act rather than letting the packages enter the mails and then, in case the initial suspicions were confirmed, trying to locate them en route and enlisting the help of distant federal officials in serving the warrant."); Terry, 392 U.S. at 26 ("A search for weapons in the absence of probable cause…however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation.")

In those cases, the Court allowed law enforcement to act on less than probable cause and

10

without a warrant because valid law enforcement objectives, i.e. officer safety and the discovery

of contraband, would be completely frustrated if the police could not first detain a person or

package pending further investigation.  However, in recognizing that a limited search or seizure

still implicated the Fourth Amendment, the Court required anyone claiming those exigencies to

have at least a reasonable suspicion of criminal activity.

It is true that the majority of cases turn on the second requirement for a Terry stop: that

the police have a reasonable suspicion.  However, there still must exist some valid law

enforcement objective explaining why the probable cause or warrant requirement need not be

met.[10]  In most mail cases, the reason offered is the difficulty of tracking a package once it has

left its point of origin, see, e.g., Van Leeuwen, 397 U.S. at 253, or the difficulty of tracking it

once it has been picked up by the recipient.  See, e.g., United States v. LaFrance, 879 F.2d 1 (1st

Cir. 1989).

However, neither of these exigencies exists in the case at bar.  Agent Ferrell chose not to

detain the package in California, perhaps because he believed that it had already left for

Massachusetts.[11]  Nevertheless, given his relationship with Old Dominion and the fact that he

was able to reroute the parcel with a mere phone call, it can hardly be said that he would have

had any difficulty in tracking the package once it was en route.  (Tr. 1, pg. 51).  Moreover, since

the package was to be delivered to a dock, not a residence, and was labeled "will call," there was

absolutely no danger of it being picked up in Dracut before law enforcement had an opportunity

---

[10] Any argument that a general law enforcement objective of preventing crime justified a diversion on less than probable cause is without merit, because, as discussed above, Agent Ferrell would not have been hindered if he let the package continue on to its destination.

[11] The record indicates that, in fact, the package remained in a truck in California for four days after the Defendant delivered it to Old Dominion.  (Exhibit 5).

to set up a controlled delivery. Thus, the only "rationale" for why Agent Ferrell should not be required to show probable cause is his incredulous assertion that he did not know if the DEA in Massachusetts would be interested in arranging for a dog sniff unless he searched the crate first. (Tr. II, pg. 180). This explanation is belied by the fact that Ferrell never contacted the Massachusetts DEA before the search, that the DEA did arrange for controlled delivery once the package was sent to Massachusetts, and that Boston DEA Agent Hershey testified at the hearing that he certainly would have been "interested" in investigating the crate, even if its contents were not yet known. (Tr. II, pg. 62).

Therefore, because he has offered no valid law enforcement objective for the diversion, even if Agent Ferrell did not need a warrant, he certainly needed probable cause. Yet all he knew at the time he ordered the rerouting was that the bill of lading was handwritten, the package was a dock to dock delivery, the sender had a twelve year-old drug conviction and a recent arrest, and a phone number listed on the bill of lading was "associated" with someone "suspected" of drug dealing. In no way do these facts establish that there was probable cause to believe the parcel contained contraband.

Although Agent Ferrell claims that Stephany told him the shipment was paid for in cash, Stephany denied this at the hearing, (Tr. I, pg. 40), and even a cursory inspection of the bill of lading makes clear the shipment had not been paid for at all. (Exhibit 2). Agent Ferrell only learned of the fraudulent addresses only after ordering the diversion. (Tr. I, pg. 147). Since it stands to reason that the fraudulent addresses and the cash payment would be the two critical factors in establishing probable cause, Agent Ferrell clearly did not have it at the time he rerouted the crate. In fact, in the government's written submissions, it continuously attempts to justify the

diversion on the basis of "reasonable suspicion," suggesting that it did not believe probable cause

existed when the diversion took place.[12]  See Gov't Memo in Opp to Def. Goldsmith's Initial

Motion to Suppress.  Since, in fact, probable cause did not exist, the diversion itself was

unlawful, regardless of whether Agent Ferrell needed a warrant.

### 2.  The nature and extent of the rerouting violated the Defendant's possessory interests

Even if Agent Ferrell did not need probable cause or a warrant to divert the package, his

entire investigation still must be "reasonable."  In LaFrance, 879 F.2d at 6, the court held that, in

analyzing whether law enforcement acted reasonably, "we must ask whether the detention, taken

as a whole, or any step therein, was unreasonable."  To make that determination, a reviewing

court must examine two factors: "nature and extent," i.e. the time of the detention and the gravity

of the intrusion.  Id.

In determining whether the nature and extent of the detention is reasonable, the court in

LaFrance analyzed both the amount of delay caused by the detention and the reasons for this

delay.  However, it only counted against the government the time after the LaFrance defendants'

possessory interests had, in effect, been vested.  That is to say, in weighing reasonableness, the

court only considered the period after the contractually agreed-upon delivery time for the

defendants' parcel had been exceeded.  The court reasoned that the defendants did not have a

possessory interest in their  mail until after the noon delivery deadline had passed, and had thus

not suffered any seizure until that point.  Id. at 7.

---

[12] When asked at the hearing by this Court as to what standard applied to diversion, the government stated it was not sure of its position and needed more time to decide.

However, in <u>LaFrance</u>, the court was concerned with only one of the two sources of possessory interest that a defendant can assert: the contractually expected delivery time.  The court also stated that a defendant has a possessory interest in the government not "interfere[ing] with the package's normal course."  <u>Id</u>.  Such an interest was decidedly <u>not</u> implicated in <u>LaFrance</u> because there delivery was merely delayed, and, as such, only the delay was analyzed for reasonableness.

In the case at bar, this Court must analyze the reasonableness of Agent Ferrell's actions from the moment the Defendant placed his parcel in the mail.  Unlike <u>LaFrance</u>, law enforcement in this case violated the Defendant's possessory interest in having his package take its "normal course," when, almost immediately after the package was delivered to Old Dominion, Ferrell needlessly ordered it to be rerouted to North Carolina.[13]  Thus, the First Circuit's admonition that "any step therein" must be reasonable, applies with particular force to this case.  <u>LaFrance</u>, 879 F.2d at 6.

The unreasonableness of the diversion is plain from Agent Ferrell's testimony.  He acknowledged on cross-examination by the Defendant's attorney that in his entire twenty-year career in law enforcement, he had never rerouted a package from one state to another.  Moreover, he testified that he could do so "on a hunch," which clearly would meet no standard of reasonableness.  Furthermore, there was no basis to even have a "hunch," as no crime had been committed in North Carolina by anyone and there was no realistic basis to suspect that North Carolina would prosecute this offense.  (Tr. I, pg. 187).  Even after he searched the package and found the so-called "smoking gun," he still sent it on to Massachusetts because he knew that the

---

[13] Indeed, the government conceded at oral argument that the diversion was a "seizure."  (Tr. II, pg. 78)

14

case could not be prosecuted in his jurisdiction. Yet, given these facts, when asked at the hearing as to why he didn't simply let the package take its "normal course" to Boston, Agent Ferrell shockingly responded that he didn't want to "abuse" his relationship with Old Dominion, and was not sure if the Massachusetts DEA would have been "interested" in seeking a warrant. (Tr. I, pg. 180).

Furthermore, in assessing reasonableness, the court in <u>LaFrance</u> seemed particularly impressed that law enforcement sought to have a dog sniff the package as soon as possible. <u>Id</u>. at 8 ("[T]he decision to probe for probable cause by using the sniff test itself suggests an attempt to reduce any intrusion.") Given that Agent Ferrell himself was a dog handler, his decision not to seek a sniff in California, Tennessee or Massachusetts makes his actions even more unreasonable. (Tr. I, pg. 153). Clearly he was not interested in minimizing the intrusion on the Defendant's rights, but rather in maintaining some ill-defined "relationship" with Old Dominion at the expense of the Fourth Amendment.[14]

### 3. The unreasonableness cannot be excused by either the independent source or attenuation doctrines

Neither the "attenuation" nor "independent source" doctrines would allow the admission of the seized evidence if the diversion violated the Fourth Amendment, since these doctrines do not apply to this case. Both "attenuation" and "independent source" are variations on the familiar

---

[14] The Defendant further contends that the unreasonableness is apparent by the fact that, not only had Agent Ferrell never before rerouted a package across state lines, but the Defendant could find no case in which law enforcement had taken such a drastic measure. In nearly all cases, the package is detained at either its origin or its destination. <u>See</u>, <u>e.g.</u>, <u>Van Leeuwen</u>, 397 U.S. at 253 (origin); <u>LaFrance</u>, 979 F.2d at 3 (destination), and in no case did the package cross state lines. <u>Cf</u>. <u>United States</u> v. <u>Aldaz</u>, 921 F.2d 227, 231 (9th Cir. 1990) (no Fourth Amendment violation where, on reasonable suspicion, package was sent from a remote location in Alaska to a more central Alaskan location where it could be subjected to a dog sniff, because of difficulty in finding dog handler in the "Alaskan bush.")

theory outlined in Wong Sun v. United States, 371 U.S. 471, 487 (1963), where the Court excluded some confessions given by the defendants yet admitted others, despite the fact that they were all obtained subsequent to unlawful searches and arrests.  In this case, the government essentially contends that the obtaining of the search warrant is sufficiently "attenuated" from the diversion so as not to be fruit of the poisonous tree.  Likewise, it claims that the search warrant is sufficiently "independent" of the unlawful diversion so as not to be tainted by the prior illegality.

Courts generally consider three factors in determining attenuation: 1) the amount of time between the illegality and the seizure of the evidence; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the misconduct.  See Brown v. Illinois, 422 U.S. 590, 603-04 (1975).  The government contends that the first factor is not relevant because it normally applies where an illegal arrest is followed by a voluntary confession.  Of course, the same could be said of the entire "attenuation" doctrine.  Nevertheless, its argument is not surprising because the time element clearly cuts in the Defendant's favor as the illegal diversion was followed shortly thereafter by the search uncovering the evidence.

As to the second element, the government contends that the search warrant itself is the "intervening circumstance" allowing admission of the evidence based on attenuation.  This logic would deprive courts of any meaningful review of the attenuation doctrine in cases such as this. In essence, the government is arguing that any illegality can be cured by a subsequent legality.[15] On the contrary, "intervening circumstance" means something completely different.  It refers to a completely neutral event such as a substantial passage of time, movement from one location to

---

[15] The Defendant does not concede the legality of the warrant, but merely accepts it for the sake of this particular argument.

another, or, in the case of multiple confessions, whether the defendant remained in custody in the interim, or was on the street.  See, e.g., United States v. Patino, 862 F.2d 128, 133 (7th Cir. 1988).  Only then has something intervened so as to "attenuate" the effect of the prior illegal entry or arrest.  See, e.g., Wong Sun, 371 U.S. at 486-89.[16]

The third element, the flagrancy of the misconduct, is addressed more fully above, as well as in section "D" below discussing the obtaining of the warrant.  Significant, however, is the fact that Agent Ferrell testified he had never taken the drastic action of diversion in his twenty-year career and the Defendant could find no such case in which a parcel was diverted several hundred miles across state lines.  This dearth of case law and the novelty of Ferrell's approach speak volumes about the gravity of his misconduct.

As for the "independent source" doctrine, the government contends that the obtaining of the warrant was independent of the diversion because nothing discovered during the diversion was used in making out the affidavit.  The government's point is off the mark, however, because in the lead case it cites there were two sets of officers, one illegally in the defendant's home, and another at the courthouse lawfully obtaining a warrant.  See Segura v. United States, 468 U.S. 796, 814 (1984).  The Court there found that the evidence discovered from the search warrant could be admitted despite the unlawful entry because one act was completely independent of the other, and no evidence gleaned from the entry was used to make out the search warrant affidavit. Id.

---

[16] It is for this reason that the attenuation doctrine simply cannot be applied to mail seizure cases, and the government does not cite one such case in its brief.  The doctrine essentially asks whether sufficient time has passed and circumstance transpired to make a subsequent statement voluntary in that it was not secured by the coercive effect of the prior illegality.  Such an analysis is impossible when the prior seizure is of a thing and not a person.

In order to utilize this exception to save an illegal seizure from the application of the exclusionary rule, however, the government must prove that the later lawful search and seizure were "<u>genuinely independent</u> of [the] earlier tainted [police actions]." <u>Murray</u> v. <u>United States</u>, 487 U.S. 533, 542 (1988) (emphasis added). In fact, in <u>Murray</u>, the Court explicitly found that no information obtained during an initial illegal entry into a warehouse was later used when seeking a search warrant but, nonetheless, remanded the case to the district court to determine whether "the agents would have sought a warrant if they had not earlier entered the warehouse." <u>Id</u>. at 543. Clearly Agent Ferrell would not have sought a warrant if he had not first illegally diverted the crate because it would have been worthless to him. <u>See</u> <u>also</u> <u>United States</u> v. <u>Zapata</u>, 18 F.3d 971, 978 (1st Cir. 1994) ("To take advantage of the independent-source doctrine, the government must also demonstrate that the "application of the doctrine . . . will not sully the prophylaxis of the Fourth Amendment.")

Furthermore, the independent source doctrine plainly does not translate to mail seizure cases like this, especially since in the case at bar the search warrant could not have been executed without exploiting the unlawful diversion. Moreover, unlike <u>Segura</u> where there were two sets of officers, in this case the officer who committed the unlawful diversion was the same officer who sought out the warrant.[17] The "independent source" doctrine allows admission of evidence when police acting lawfully obtain that evidence truly independent of those acting unlawfully. In the instant case, that officer is one and the same, and his "lawful" activity could only be accomplished with, and was dependent on, the unlawful diversion.

---

[17] Certainly the admission of evidence where the same officer commits the illegal and legal act would certainly not deter future police misconduct. <u>Zapata</u>, 18 F.3d at 978.

### D.  THE SEARCH WARRANT WAS IMPROPERLY OBTAINED

#### 1.  There was no jurisdiction to issue the warrant

The State of North Carolina did not have jurisdiction to issue the search warrant because the package did not contain evidence of a crime which had been or was being committed in North Carolina, nor did it "disclose the identity of a participating in" a violation of North Carolina law.  (Exhibit 11).  Thus, the warrant was invalid on its face and cannot be saved by the good faith exception.

The Application for Search Warrant states that "there is probable cause to believe that [the marijuana] constitutes evidence of a crime and the identity of a participating in a crime [to wit:] Violations of North Carolina Controlled Substances Act, G.S. 90-95."  (Exhibit 11).  This statement is plainly inaccurate as the crate was not evidence of any violation of North Carolina law, nor did it disclose the perpetrators of any such violation.  The only reason the crate was in North Carolina was because Ferrell diverted in there.  The Defendant never possessed in in North Carolina, he never intended to possess it, nor did he intend to deliver it there.  Therefore, since there was no violation of "G.S. 90-95," the warrant was facially invalid and the search was unlawful.

#### 2.  Agent Ferrell executed the warrant in bad faith

Even if the warrant is not facially invalid, the magistrate issued it only because he was not informed of the crucial fact that the crate was brought into North Carolina by a law enforcement agent or that the Defendant had never been in the jurisdiction.  The good faith doctrine does not

excuse the use of a defective warrant when 1) the magistrate is "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; (2) the magistrate "wholly abandons his [detached and neutral] judicial role"; (3) the warrant is "so facially deficient…that the executing officers cannot reasonably presume it to be valid"; or (4) the supporting affidavits are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." United States v. Leon, 468 U.S. 897, 923 (1984) (internal quotations omitted).[18]

Even though the good faith exception has narrowed the application of the exclusionary rule, the latter is still "alive and well to the extent that a warrant's defectiveness results from either (1) non-technical errors of a kind that a reasonably prudent officer would (or should) have recognized, or (2) law enforcement officers' acts or omissions of a kind that a reasonably prudent officer would have avoided." United States v. Ricciardelli, 998 F.2d 8, 15 (1st Cir. 1993), citing 1 LaFave, Search and Seizure § 1.2(d), 38 (1987) (explaining that searching officer's erroneous understanding of Fourth Amendment limits on his power still presents a compelling case for exclusion). Moreover, the government faces a "high hurdle" to show good faith where "critical information known to the officer is omitted" from the affidavit. United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001).

---

[18] This is similar to a Franks analysis, which allows a defendant to challenge a warrant: "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause…" Franks v. Delaware, 438 U.S. 154, 155-56 (1978).\

While it is plausible, although highly unlikely,[19] that Agent Ferrell believed the shipment was paid for in cash by the sender, it is undisputed that he failed to disclose the diversion of the package to the magistrate. Since that was such a central fact, it stretches credibility to believe that Agent Ferrell did not purposely leave it out of his affidavit. Indeed, this Court stated at the hearing that the failure to disclose the diversion was "intentional," in that Agent Ferrell knew he had diverted the crate but withheld that information. Therefore, the only question is whether that failure to disclose the diversion "misled" the magistrate, i.e. whether it could have affected the probable cause determination. (Tr. II, pgs. 69-70).

By diverting the package to North Carolina, Agent Ferrell exercised "dominion and control" over the shipment and interfered with the Defendant's possession of it. See Jacobsen, 466 U.S. at 120 (a seizure is an "assertion of dominion and control over [a] package" and "some meaningful interference with an individual's possessory interests in that property.") As such, from the point at which Agent Ferrell diverted the crate, the Defendant could no longer control the route the shipment took, when, where or how it was to be delivered, and he no longer had the authority to exclude others from accessing it. Therefore, in no way can it be reasonably argued that he had constructive possession of the crate while it was in North Carolina. Thus, because a reasonably prudent officer should have known that the doctrine of constructive possession could not apply to the facts of this case, because the error was not technical, but rather substantive, and because a magistrate fully apprised of the facts of the diversion would not have found probable cause, the good faith exception cannot save the invalid warrant. See Ricciardelli, 998 F.2d at 15.

---

[19] Since Agent Ferrell possessed the bill of lading which was clearly marked "collect," indicating that the shipment had yet to be paid for, it is hard to believe he thought it had already been paid for in cash.

### 3. The government cannot excuse the warrant's invalidity with the inevitable discovery doctrine

The inevitable discovery doctrine permits the introduction of evidence obtained in an illegal search only if such evidence would inevitably have been discovered through an independent legal search. United States v. Silvestri, 787 F.2d 736, 744-45 (1st Cir. 1986). Courts apply a three-part test for analyzing the inevitable discovery exception:

> [F]irst, whether the legal means [are] truly independent; second, whether both the use of the legal means and the discovery by that means are truly inevitable; and, third, whether the application of the inevitable discovery exception either provides an incentive for police misconduct or significantly weakens Fourth Amendment protection.

United States v. Pardue, 385 F.3d 101, 106 (1st Cir. 2004) (alterations in original).

The government must make a specific showing of inevitability and bears the burden of proving it by a preponderance of the evidence. United States v. Ford, 22 F.3d 374, 379 (1st Cir. 1994), citing Nix v. Williams, 467 U.S. 431, 444 n.5 (1984) (inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings.")

The Defendant questioned the validity of the warrant in his initial memorandum. Yet at no time in its responses, or in its argument to the Court, did the government raise the issue of inevitable discovery. Thus, the issue was waived. See United States v. Ornelas-Ledesma, 16 F.3d 714, 721 (7th Cir. 1994), rev'd on other grounds (inevitable discovery is subject to waiver); United States v. Sherman, 2005 U.S. Dist. LEXIS 2982 at *17 (D. Me. Feb. 18, 2005) (failure to raise inevitable discovery defense at suppression hearing is deemed a waiver).

Moreover, even if it was not waived, it is the government's burden to show the evidence would have been inevitably discovered.  Ford, 22 F.3d at 379.  Not a shred of evidence was presented at the hearing which would indicate what would have happened had the warrant not been issued or the diversion not occurred.  Therefore, the inevitable discovery exception cannot justify admitting the illegally seized evidence.

> Respectfully Submitted,
> Joshua Goldsmith,
> By His Attorneys,
>
>
> //s//Stephen Hrones
> Stephen Hrones
> BBO No. 242860
> Michael Tumposky
> BBO No. 660618
> Hrones, Garrity & Hedges
> Lewis Wharf -- Bay 232
> Boston, MA  02110-3927
> T) 617-227-4019

Dated: December 9, 2005

## CERTIFICATE OF SERVICE

I, Stephen Hrones, hereby certify that, on this the 9th day of December, 2005, I have caused to be served a copy of this document where unable to do so electronically, by first-class mail, postage prepaid, to all counsel of record in this matter.

> //s//Stephen Hrones
> Stephen Hrones