UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
        v.                  )    Cr. No. 03-10234-MLW
                            )
JOSHUA GOLDSMITH            )

MEMORANDUM AND ORDER

WOLF, D.J.                                    March 14, 2006

I.  SUMMARY

On July 15, 2003, John Gillies was indicted for conspiracy to possess with intent to distribute marijuana and possession of marijuana with intent to distribute.  On August 5, 2003, a Superceding Indictment was returned which alleged that Benjamin Silver participated in Gillies' crimes.  The government subsequently obtained the cooperation of John Ryan, an unindicted coconspirator in this case who is charged separately in another case.  As a result of Ryan's cooperation, on May 4, 2004, a Second Superceding Indictment was returned.  It charges that Joshua Goldsmith also conspired with Gillies, and possessed marijuana with intent to distribute it or aided and abetted that crime.

In 2005, Silver pled guilty.  Gillies and Goldsmith filed motions to suppress the crate of marijuana that is at the heart of this case, alleging that it was obtained as a result of an unlawful seizure and an unlawful search.  An evidentiary hearing on the motions to suppress was conducted on November 16 and 17, 2005.

The evidence at that hearing brought into sharp focus the threshold issues of whether Gillies and/or Goldsmith had the

legally required Fourth Amendment interest in the crate of marijuana at the times it was seized and searched to permit them to contest the lawfulness of the government's conduct. Therefore, the court ordered further briefing on this issue.

Gillies, however, pled guilty rather than pursue his motion to suppress. After receiving additional submissions from the government and Goldsmith, the court conducted a further hearing on January 16, 2006, concerning Goldsmith's motion to suppress.

For the reasons described in detail in this Memorandum, the court concludes that Goldsmith did not have an interest protected by the Fourth Amendment in the crate of marijuana at the times it was seized and searched. Therefore, he may not contest the lawfulness of the government's conduct. Thus, Goldsmith's motion to suppress must be denied. Accordingly, it is not necessary or appropriate for the court to decide the other challenging Fourth Amendment issues presented by the facts of this case.

II. FACTS

The following facts have been proven by a preponderance of the evidence.[1]

On May 15, 2003, Goldsmith delivered a crate containing

---

[1]The court is making some findings of fact that relate to issues that would have to be decided if Goldsmith had the Fourth Amendment interest necessary to contest the legality of the government's conduct.

2

marijuana to the Old Dominion Freight Company in Point Loma, California and arranged to have the package transported to Old Dominion's warehouse in Dracut, Massachusetts. Goldsmith Aff. ¶1; Suppression Hearing Exhibit ("Ex.") 2.[2]  Although not shipped with a guaranteed delivery time, which would have required extra payment, Old Dominion represented that delivery would be made within five business days, not counting the drop-off day. Nov. 16, 2005 Tr. at 48-49.  Therefore, the crate was expected to be delivered to Dracut, Massachusetts by May 22, 2003, but the customer did not have a contractual right to delivery by that date.

Freight charges for the crate were not prepaid.  Rather, the crate was shipped collect, with the freight charges to be paid by the consignee.  Old Dominion characterizes collect shipments as "cash transactions." Nov. 16, 2005 Tr. at 26, 40.

In arranging for delivery, Goldsmith filled out a  bill of lading.  The document is captioned "Straight Bill of Lading" and states that it is "Not Negotiable." Ex. 2.  On the bill of lading Goldsmith listed the sender as Underwater Equipment Sales, 317 Catalina Ct., Pt. Loma, CA 92107, and the consignee as DVP Diving & Video, 33 Silva Lane, Dracut, MA, 01826. Goldsmith Aff. ¶3; Ex. 2. Both of these were fictitious names for nonexistent entities. On the line of the bill of lading for the sender's signature,

---

[2]Unless otherwise indicated, all referenced exhibits were admitted at the Suppression Hearing on November 16 and 17, 2005.

Goldsmith also signed a fictitious name, "K. Cleary." Ex. 2. After filling out the bill of lading, Goldsmith provided Old Dominion employees with a copy of his driver's license, which listed his real name and address. Ex. 4.

As Gillies stated in his affidavit, which provides the only evidence concerning the ownership of the crate and marijuana:

> In the spring of 2003, [Gillies], along with several other people, made arrangements to purchase a large amount of marijuana in California. [Gillies] supplied the money for the marijuana and was the owner of the drugs. The other people arranged for the purchase of the marijuana and its transport from California to Massachusetts. [Gillies] was supposed to give them a portion of the marijuana when it arrived in Massachusetts.

Gillies Aff. ¶2. Goldsmith did not own either the marijuana or the crate. The shipment was owned by Gillies. Goldsmith participated in arranging the transport of the marijuana on Gillies's behalf. Id.

After delivering the marijuana to Old Dominion, Goldsmith provided the bill of lading for the crate to Gillies, who had it when the crate was delivered to Massachusetts on May 27, 2003. Nov. 17, 2005 Tr. at 21-23, 35. Goldsmith expected the contents of the crate would remain private while it was in transit. Goldsmith Aff. ¶2.

Geoff Stephany, Old Dominion's director of security, had a practice of searching Old Dominion's computer system to identify suspicious packages. Nov. 16, 2005 Tr. at 31. He would search the system for freight with characteristics he associated with

4

contraband, mainly characteristics that would help a shipper conceal his identity. For example, he would search for shipments called "dock-drop offs," which were shipments that a customer had brought directly to Old Dominion's shipping docks instead of allowing Old Dominion to send a truck to pick up the shipment at the sender's place of business. Dock drop-offs were unusual, accounting for only 15 to 30 of 20,000 packages Old Dominion received each day. Id. at 26, 29, 30, 76. Stephany associated dock drop-offs with illegal drug shipments because they allowed senders and recipients to conceal their identities more easily. Id. at 31.

Stephany would also search for dock pick-ups and shipments tendered "on a cash basis," both of which were unusual and suspicious for similar reasons. Id. at 31. "Cash basis" did not actually require a payment in cash. Rather, a shipment was on a "cash basis" if the freight charges were to be paid before Old Dominion released the shipment for pickup. See id. at 109.

If a shipment matched one of Stephany's criteria, he would consider it more carefully, looking for "abnormalities." Id. at 32. For example, he would examine how specifically the shipper had described the freight on the bill of lading and how the shipment was packaged. Id. at 32-33. He also would look to see whether the description included a National Motor Freight Classification, because packages without one were unusual. In addition, he considered whether the shipment was crated, because in his

experience contraband tended to be crated. Id. at 33.

On May 16, 2003, the day after Goldsmith delivered the crate to Old Dominion in Point Loma, California, Stephany identified it as suspicious. Nov. 16, 2005 Tr. at 34-35, 63. Stephany flagged Goldsmith's shipment because it was a dock drop-off, because it was crated, because it was also a dock pick-up, and because there was a misspelling on the package. Id. at 35, 77.

Following his practice for dealing with suspicious packages, Stephany contacted Marty Ferrell, a Highpoint, North Carolina police officer assigned to the federal Drug Enforcement Administration ("DEA") Task Force. Id. at 116-17. Stephany had worked previously with Ferrell when Stephany had identified suspicious packages. Id. at 33-34. He contacted Ferrell because Stephany knew Ferrell and believed that Ferrell would handle any investigation properly. Id.

Ferrell had about 14 years of experience investigating drug cases and had received more than a thousand hours of specialized training relating to drug investigations. Id. at 119. He was a certified teacher for the state of North Carolina police recruit school, and also taught at community colleges on controlled substance violations and narcotics interdiction. Id.

Stephany told Ferrell that Stephany had "a shipment that was tendered to us in San Diego that [Ferrell] may want to take a look at." Id. at 37. Stephany told Ferrell that the package was still in

San Diego, <u>id.</u> at 37, and probably said that the crate "was going to be paid by a cash transaction at destination." <u>Id.</u> at 40. Stephany faxed the bill of lading and Goldsmith's driver's license to Ferrell.  <u>Id.</u> at 41-42; Ex. 4.

Ferrell immediately ran Goldsmith's name through a DEA database. From the DEA database, Ferrell learned that Goldsmith had been convicted of possessing marijuana with intent to distribute in 1991, and that he had been arrested in 2001 for possessing marijuana for sale and for conspiracy. <u>Id.</u> at 123; Ex. 11 at 3. Ferrell also ran all of the telephone numbers that were on the bill of lading through the database and learned that one of them was associated with Michael Joseph Doyle, who also had been involved with narcotics. <u>Id.</u> at 124.

Shortly after receiving this information on May 16, 2006, Ferrell telephoned Stephany and asked him to divert the crate to North Carolina, where he intended to conduct a narcotics detection dog sniff. <u>Id.</u> at 72-74, 79, 90, 125.  Stephany agreed to do so.

At the time of Ferrell's request, the crate was in a closed truck in San Diego, California.  <u>Id.</u> at 80. It had not yet departed, but could have left at any time. <u>Id.</u> Stephany allowed the crate to stay on the truck, which brought it to Old Dominion's hub in Morristown, Tennessee. When it reached Morristown, Stephany had the package intercepted and driven to Greensboro, North Carolina, where it would not have traveled in its normal course to Dracut,

Massachusetts. Id. at 79.  He was responding to Ferrell's request.

Ferrell's request to divert the crate was not unusual. If Ferrell suspected that one of Old Dominion's packages going to the eastern seaboard contained contraband, he would routinely ask Stephany to re-route it to North Carolina. Id. at 87.[3]

During the weekend after Ferrell requested the diversion, May 17-18, 2003, Ferrell investigated further. Id. at 126. First, he called Point Loma, California, and spoke with Wayne Starr, a DEA task force officer. Ferrell asked Starr to check on Underwater Equipment Sales and the address 317 Catalina Court, Point Loma, California. Starr told Ferrell that the address 317 Catalina Court did not exist in Point Loma and that Underwater Equipment Sales did not exist "in the area." Id. at 126-27.

Ferrell made a similar telephone call to Massachusetts, where he spoke to Detective Chikutas. Id. at 127. Chikutas told Ferrell that 33 Silva Lane, Dracut, Mass., was the address of Old Dominion

---

[3]Although Ferrell testified that this was the first and only time he had ever asked to have a package rerouted to North Carolina, Nov. 16, 2005 Tr. at 155, the court does not find this testimony to be credible. As Stephany testified, Ferrell had asked Stephany to divert packages before and Stephany had done so. Id. at 87.

Similarly, although Ferrell testified that Stephany told him the package was already en route, Id. at 149-50, Stephany denies saying this. Id. at 80. The court finds that Stephany did not tell Ferrell that the package was en route.

and that" DVP Diving Studio"[4] did not exist "in that area." Id. at 127.

In addition, Ferrell ran a computerized criminal history on Goldsmith. Id. at 128. He also made some other calls about Underwater Equipment Sales. Id.

Ferrell was concerned that if he simply passed the results of his investigations on to the DEA in Boston it would not pursue the matter. Id. at 180. In his experience, other agents were often too busy to conduct further investigation. Id. Because he could not assume that the DEA in Boston would be willing and able to obtain a warrant, Ferrell wanted to handle the matter himself. Id.; see also Gov. Request for Findings of Fact at 21.

By May 19, 2003, Ferrell's investigation was complete and he decided to apply for a search warrant in the North Carolina state court. Id. at 128-29. Ferrell knew that a state judge in North Carolina could not issue a warrant ordering that a search be conducted in another state. He believed that a state judge in North Carolina could only issue a warrant if a crime was being committed in that state. Id. at 201.[5] Ferrell knew that if he applied for

---

[4] Ferrell testified that he asked about "DVP Diving Studio" rather than "DVP Diving & Video". Nov. 16, 2005 Tr. at 127.

[5] Ferrell's understanding that a state judge in North Carolina could only issue a warrant if a crime was being committed in that state may have been incorrect. North Carolina General Statutes §15A-242 states, in pertinent part, that "[a]n item is subject to seizure pursuant to a search warrant if there is probable cause to believe that it: . . . (2) Is contraband or

a warrant and told the judge that Old Dominion had a suspicious crate in Tennessee that ordinarily would not pass through North Carolina, the judge would not have issued a warrant to seize and search it.

As the government acknowledges, law enforcement took control of the crate when it departed Morristown, Tennessee on May 21, 2003, at 2:31 a.m., for delivery to Old Dominion's Greensboro, North Carolina facility.  Gov. Request for Findings of Fact at 7. The government also acknowledges that the diversion constituted a seizure.  Id. at n.2; Nov. 17, 2005 Tr. at 78.

Although his investigation was complete on May 19, 2003, Ferrell waited until after the diversion and seizure of the crate on May 21, 2004, to apply for a search warrant. He went before a state court judge to obtain the warrant although he did not know whether any eventual prosecution would occur in state or federal court. Nov. 16, 2005 Tr. at 131. Ferrell did not consult any prosecutor, but prepared and presented the application for a warrant on his own.  Id. at 202.

In his affidavit to the North Carolina court Ferrell made a number of misleading or false statements, and at least some of them were deliberate.  More specifically, Ferrell stated that the

otherwise unlawfully possessed; or . . . (4) Constitutes evidence of an offense . . . "  It appears that if the crate had come to North Carolina in the ordinary course, rather than after being seized in Tennessee, a warrant could have been issued to seize the marijuana as contraband.

suspicious crate "will be on the docks of Old Dominion Freight Line, 7715 Evans Town Road, Greensboro, N.C." Ex. 11 at 2. However, he intentionally did not reveal that it would be there only because he had caused the crate be diverted to North Carolina. Nov. 16, 2005 Tr. at 162.

Ferrell also stated that he had evidence that a crime was taking place in North Carolina, namely violations of the North Carolina Controlled Substances Act, G.S. §90-95, which prohibits the manufacture, sale, delivery, and possession of a controlled substance in North Carolina. N.C. Gen. Stat. § 90-95. Farrell testified that he knew when he signed the affidavit that no person in North Carolina was attempting unlawfully to possess marijuana in that state. Id. at 164. However, he claimed that he believed when he had the crate diverted to North Carolina that Goldsmith was "constructively" possessing marijuana in the state and, therefore, that a crime was taking place in North Carolina. Id. at 201-02. The court finds, however, that Ferrell had taken control of the crate and understood that no criminal was constructively possessing the marijuana in North Carolina.

Ferrell stated incorrectly in his affidavit that "payment for the shipment was made in cash." Ex. 11 at 2. At the time of his affidavit, no one had paid for the shipping charges, and the bill of lading clearly indicated this. Id. at 104. Stephany states, however, that he probably told Ferrell that "[shipment] was going

11

to be paid by a cash transaction at destination." <u>Id.</u> at 40. It is possible that Ferrell misunderstood what this meant. <u>See</u> <u>id.</u> at 150-51.

In addition, Ferrell represented in his affidavit that "[a]ccording to the Manager of Security identification is required for all shipments paid in cash, which, is how Old Dominion Freight Line identified Goldsmith." Ex. 11 at 3. However, Old Dominion does not require identification for all "cash payments," but only for dock drop-offs and dock pick-ups. <u>Id.</u> at 110-12. Stephany denies telling Ferrell otherwise. <u>Id.</u>

Ferrell obtained a search warrant at 9:19 a.m. on May 21, 2003. Ex. 11. He executed the warrant and seized the crate at 9:55 a.m. Ex. 14. Inside, he found bundles or bricks of marijuana. <u>Id.</u> at 134.

The search warrant included several "inventory pages," which Ferrell was required to file if he seized anything. <u>Id.</u> at 164-65; Ex. 11 at 7. The inventory pages, which Ferrell signed, also required the Highfield Police to "hold the seized property subject to court order." <u>Id.</u> at 166.

Ferrell did not, however, file an inventory or obey the order to hold the property. <u>Id.</u> at 166. Rather, he arranged to have a DEA pilot fly the crate from Greensboro, North Carolina to Boston, and for a controlled delivery by the Boston field office of the DEA. <u>Id.</u> at 135-36.

By arranging for the DEA to fly the crate from North Carolina to Boston, Ferrell ensured that the package arrived on the same day that it would have without the diversion. Absent the diversion, the crate would have traveled on the same truck as another package that was shipped from San Diego to Boston. That package arrived in Boston at 12:03 a.m. on May 22, 2003. Id. at 57-58. Goldsmith's crate also arrived in Boston on May 22, 2003. Nov. 17, 2005 Tr. at 53-54. When the crate arrived in Boston, DEA agents took it to the Massachusetts State Police barracks at the airport. Nov. 17, 2005 Tr. at 17.

On May 27, 2003, Gillies arrived and presented the original customer copy of the bill of lading for the crate. Id. at 20-21. He also presented a false identification in the name of Robert Burgess, which a police officer photocopied. Id. at 24-25; Ex. 16. Gillies paid for the freight, signed for the crate, and attempted to take it away. Id. at 25. However, it would not fit in his vehicle. Id. at 25.

On May 28, 2003, Gillies returned, driving a rented moving truck, and took the crate. Id. at 26-27. Law enforcement officers followed him as he drove from Dracut to Canton, Massachusetts. Id. at 27. When Gillies arrived in Canton, he stopped in the parking lot of a liquor store and met with the occupants of a Ford station wagon. Both vehicles left the parking lot and drove to a storage facility. Id. at 27. Gillies was arrested there based on the

13

evidence in this case.  Benjamin Silver, who was with Gillies, was arrested on outstanding warrants.  Id. at 29-30.

On July 15, 2003, a grand jury indicted Gillies for conspiring to possess marijuana with intent to distribute and possession of marijuana with intent to distribute.  See Dkt. No. 6.  The same charges were brought against Silver in a Superceding Indictment returned on August 5, 2003.  See Dkt. No. 10.  After the government obtained the cooperation of Ryan, on May 4, 2004, Goldsmith was charged in a Second Superceding Indictment.  See Dkt. No. 54.


III. ANALYSIS

    A.    Goldsmith's Claims

Goldsmith asserts that the seizure of the crate of marijuana in Tennessee without a warrant was unreasonable and unlawful.  See United States v. LaFrance, 879 F.2d 1 (1st Cir. 1989).  He also argues that the North Carolina warrant was obtained as a result of deliberately false and misleading material representations and omissions, and, therefore, the evidence obtained as a result of the ensuing search must be suppressed.  See Franks v. Delaware, 438 U.S. 154 (1978).  Goldsmith contends that because the warrant was obtained as a result of deliberately false and misleading statements, the good faith exception to the exclusionary rule does not apply.  See United States v. Leon, 468 U.S. 897, 923 (1984); United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001).  He

14

also argues that the evidence is not saved by inevitable discovery
or independent source doctrines.  See United States v. Pardue, 385
F.3d 101, 106 (1st Cir. 2004); Broom v. Illinois, 422 U.S. 590,
603-04 (1975); United States v. Zapata, 18 F.3d 971, 978 (1st Cir.
1994).

If properly presented, the foregoing issues would be
challenging.  However, as explained below, Goldsmith has failed to
prove that he had a Fourth Amendment interest in the crate at the
times that it was seized and searched.  Thus, the lawfulness of the
search and seizure has not been legitimately put into issue.  See
United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988).
Accordingly, the court may not properly proceed with the Fourth
Amendment analysis and, therefore, is not doing so.  See United
States v. Lewis, 40 F.3d 1325, 1333 (1st Cir. 1994).

    B.    The Seizure and Search Did Not Involve
          Goldsmith's Fourth Amendment Interest

The Fourth Amendment prohibits the government from engaging in
"unreasonable" searches and seizures of, among other things, a
person's "effects."[6] Generally, evidence obtained as a result of a

---

[6]The Fourth Amendment states: "The right of the people to be
secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures, shall not be violated, and no
Warrants shall issue, but upon probable cause, supported by Oath
or affirmation, and particularly describing the place to be
searched, and the persons or things to be seized."

violation of a defendant's Fourth Amendment rights may not be used against him. See Wong Sun v. United States, 371 U.S. 471, 484 (1963).

However, "a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights." United States v. Payner, 447 U.S. 727, 731 (1980) (emphasis added); see also Rakas v. Illinois, 439 U.S. 128, 133-40 (1978). A "defendant's Fourth Amendment rights are violated only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party." Payner, 447 U.S. at 731 (emphasis in original).

As the Supreme Court has more recently elaborated:

> [I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place [or property] searched, and that his expectation is reasonable; i.e., one that has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property or to understandings that are recognized and permitted by society."

Minnesota v. Carter, 525 U.S. 83, 88 (1998) (quoting Rakas, 439 U.S. at 143-44 and n.12) (emphasis added). Therefore, it is necessary, but not sufficient, that a defendant have a subjective expectation of privacy. United States v. Jacobsen, 466 U.S. 109, 122-23 and n.22 (1984). In addition, any subjective expectation of privacy must be one that society is prepared to recognize as reasonable. Id. (citing Katz v. United States, 389 U.S. 347, 361

16

(1967) (Harlan, J., concurring)).

Goldsmith has the burden of proving that he had a Fourth
Amendment interest in the crate that was allegedly unlawfully
seized and searched. See Rawlings v. Kentucky, 448 U.S. 98, 104
(1980); Lewis, 40 F.3d at 1333. More specifically, "'to prove a
Fourth Amendment violation, [Goldsmith] must demonstrate not only
that he exhibited a subjective expectation of privacy, but also
that his expectation was justifiable under the attendant
circumstances.'" Lewis, 40 F.3d at 1333 (quoting, United States v.
Cruz Jimenez, 894 F.2d 1, 5 (1st Cir. 1990)).

"Such an expectation of privacy is a threshold standing
requirement that a defendant must establish before a court can
proceed with a Fourth Amendment analysis." Id. "Unless and until
the standing threshold is crossed, the bona fides of the search and
seizure are not put legitimately into issue." Aguirre, 839 F. 2d at
856.

In his affidavit, Goldsmith asserts that he "mailed a package
from the Old Dominion Freight Company in Point Loma, California to
its warehouse in Dracut, Massachusetts" and that he "fully expected
the contents of the package to remain private for the entire time
the package was in transit . . . ." Goldsmith Aff. ¶¶ 1, 2. The
government does not dispute that Goldsmith had the necessary
subjective expectation of privacy.

However, Goldsmith has not proven that his subjective

17

expectation of privacy was one that was objectively reasonable at the times of the seizure and search of the crate. Therefore, he does not have the required Fourth Amendment interest to contest the seizure or the search. See Lewis, 40 F.3d at 1333; Aquirre, 839 F.2d at 856.

"[T]he test of legitimacy is not whether an individual chooses to conceal assertedly 'private activity,' but instead 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.'" California v. Ciaralo, 476 U.S. 207, 212 (1986) (quoting Oliver v. United States, 466 U.S. 170, 182-83 (1984)). As indicated earlier, "'[l]egitimation of expectations of privacy by law must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Jacobsen, 466 U.S. at 122 n.22 (quoting Rakas, 439 U.S. at 143-44 n.12); Carter, 525 U.S. at 88; see also LaFrance, 879 F.2d at 7 (stating "a possessory interest derives from rights in property, delineated by the parameters of law, in this case contract law" and characterizing Jacobsen as holding that "expectation of privacy derives from property law and longstanding cultural expectations."). The court must "evaluate [Goldsmith's] interest as if the [crate] contained legitimate goods." LaFrance, 879 F.2d at 7 (citing Jacobsen, 466 U.S. at 114).

"No single factor determines whether an individual" has a

18

Fourth Amendment interest that may be violated by a search or seizure. Oliver, 466 U.S. at 177. The First Circuit has:

> often catalogued the sort of factors which are pertinent to this threshold inquiry: ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. See, e.g., United States v. Gomez, 770 F.2d 251, 254 (1st Cir. 1985); United States v. Lochan, 674 F.2d 960, 965 (1st Cir.1982). We look, in short, to whether or not the individual thought of the place (or the article) as a private one, and treated it as such. If the movant satisfies us on this score, we then look to whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances. Whatever facts may shed light upon either step of this two-tier inquiry may be weighed in the balance.

Aguirre, 839 F.2d at 856-57.

In this case, consideration of the relevant factors persuades the court that while Goldsmith has proven that he was the deliverer of the crate to Old Dominion, he has not established that he was the owner or sender of it. Accordingly, the court finds that Goldsmith may have had a Fourth Amendment interest in the crate when it was in his possession and control. See Rakas, 439 U.S. at 143 n.12 ("one who . . . lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude."). However, Goldsmith has not proven that he had such an interest in the crate at the later times of the seizure and of the search.

The court recognizes that "[l]etters and other sealed packages

19

are in the general class of effects in which the public at large
has a legitimate expectation of privacy." Jacobsen, 466 U.S. at
114. "Individuals do not surrender their expectations of privacy
in closed containers when they send them by mail or common
carrier." United States v. Villarreal, 963 F.2d 770, 773-74 (5th
Cir. 1992); see also United States v. Ghali, 317 F. Supp. 2d 708,
712 (N.D. Tex. 2004). "Both senders and addressees of packages or
other closed containers can reasonably expect that the government
will not open them." Villarreal, 963 F.2d at 774; see also Ghali,
317 F. Supp. 2d at 712.

However, Goldsmith has not proven that he was the sender of
the crate. As described earlier, on May 15, 2003, he delivered the
crate to Old Dominion in California. Goldsmith Aff. ¶1. On the
bill of lading he listed as the sender, "Underwater Equipment
Sales, 317 Catalina Ct., Pt. Loma, CA 92107." See Ex. 2. There
was no such entity. On the line of the bill of lading for the
sender's signature, Goldsmith signed a fictitious name, "K.
Cleary." Id. Goldsmith did, however, allow Old Dominion to
photocopy his driver's license, which listed his real name and
address.

As described earlier, the only evidence concerning the
ownership of the crate and drugs was presented in the Affidavit of
John Gillies. Gillies asserts that:

    In the spring of 2003, I, along with several other
    people, made arrangements to purchase a large amount of

> marijuana in California.  I supplied the money for the
> marijuana and was the owner of the drugs.  The other
> people arranged for the purchase of the marijuana and its
> transport from California to Massachusetts.  I was
> supposed to give them a portion of the marijuana when it
> arrived in Massachusetts.

Gillies Aff. ¶2.  Therefore, the court finds that Gillies was the owner of the marijuana.

Goldsmith provided the bill of lading for the crate to Gillies, who had it when the crate was delivered to Massachusetts on May 27, 2003.  See Nov. 17, 2005 Tr. at 21-23, 35.  Neither Goldsmith's affidavit nor any other evidence indicates that Goldsmith even kept a copy of the bill of lading.[7]  Goldsmith has not proven that he possessed the bill of lading when the crate was diverted from Tennessee to North Carolina on May 21, 2003, or when it was searched in North Carolina later on that day.  See Nov. 16, 2005 Tr. at 53-55.

Moreover, the bill of lading in this case would not have provided Goldsmith the legal right to control or possess the crate. The document is captioned "Straight Bill of Lading" and states that it is "Not Negotiable."  Ex. 2.  The consignee is listed as DVP

---

[7]In his Supplementary memorandum, Goldsmith's counsel states that Goldsmith kept a copy of the bill of lading.  Goldsmith Supp. Memo at 2.  This unverified statement is not evidence. Moreover, the government has not had the opportunity to contest its veracity, which the court would have provided if the claim had been included in Goldsmith's affidavit and the government requested an opportunity to cross-examine him on it.  Therefore, the court is not crediting the contention that Goldsmith kept a copy of the bill of lading.

Diving and Video of Dracut, Massachusetts. Id. "A 'straight bill of
lading' . . . requires delivery of the goods to the consignee."
Intech, Inc. v. Consolidated Freightways, Inc., 836 F.2d 672, 674
(1st Cir. 1987); see also 22 Williston on Contracts §59:9 (4th Ed.)
("'A bill of lading is non-negotiable if the bill states that the
goods are to be delivered to a consignee.'" (quoting 49 U.S.C.
§80103(b)).  Therefore, as a matter of law, the bill of lading in
this case required delivery to DVP Diving and Video no matter who
possessed the document.  Id.; compare Evergreen Marine Corporation
v. Six Consignments of Frozen Scallops, 4 F.3d 90, 92 n.1
(explaining that "[a]n order bill of lading is a negotiable
instrument") and 22 Williston on Contracts §59:9 (4th Ed.) (same).

    The relevant factors indicate that Goldsmith did not have a
legitimate expectation of privacy in the crate when it was seized
or when it was searched.  See Aguirre, 839 F.2d at 856-57.  As the
purported sender Underwater Video was a fictitious entity,
Goldsmith could not, and did not, have an ownership interest in it.
This contrasts with Ghali, in which the bills of lading showed that
the sender was a real firm in which the defendant shared an
ownership interest and which the government claimed he controlled.
Ghali, 317 F. Supp. 2d at 713.

    As described earlier, Gillies, not Goldsmith, owned the
marijuana and, by inference, the crate that was seized and
searched.  See Aguirre, 839 F.2d at 856.  Goldsmith did not

22

actually possess the crate when it was seized or when it was searched. Id. It is not proven that he had any bill of lading at the times of the seizure and of the search, and even if he had the "straight bill of lading" that he at some point sent to Gillies, it would not have given him, as opposed to DVP Diving and Video, a legal right to the crate. See Intech, Inc., 836 F.2d at 674.

Gillies does state in his affidavit that the consignee of the crate, DVP Diving and Video, is not: "an actual company. Instead, this name was an alias for me and my coconspirators." Gilles Aff. ¶5. Once again, however, in contrast to the defendant in Ghali, 317 F. Supp. 2d at 713, Goldsmith could not, and did not, have an ownership interest in the phony purported consignee, DVP Diving and Video.

However, Gillies' contention that DVP Diving and Video was an alias for him and his coconspirators raises the question of whether Goldsmith should be found to have had a legitimate expectation of privacy pursuant to the Sixth Circuit's reasoning in Villarreal, supra. In Villarreal, a drum containing marijuana was opened by customs agents before being delivered. Villarreal, 963 F.2d at 773. It was one of two drums addressed to "Roland Martin," which "was a fictitious name used to ship the drums so that no one could be connected to the marijuana in case anything went wrong." Id. The defendants, Villarreal and Gonzalez, "were the intended recipients of the drums." Id. They had the receipt for them and,

therefore, the power to control their delivery.  <u>Id.</u>  Villarreal
and Gonzalez hired two unwitting other people to pick up the drums
and gave them the receipt necessary to do so.  <u>Id.</u>  The defendants
followed them to the terminal, where the drums were received, and
to another site at which the drums were transferred to the
defendants' truck shortly before they were arrested and the drums
were seized.  <u>Id.</u>

In finding that both Gonzalez and Villarreal had a Fourth
Amendment interest that was violated by the search and seizure, the
Sixth Circuit wrote:

> Although the consignee of the drums was technically a
> fictitious person named Roland Martin, this court
> has made clear that individuals may assert a reasonable
> expectation of privacy in packages addressed to them
> under fictitious names. <u>See</u> <u>United States v. Richards</u>,
> 638 F.2d 765, 770 (5th Cir. 1981); <u>see</u> <u>also</u> <u>United States
> v. Pierce</u>, 959 F.2d 1297, 1303 n. 11 (5th Cir.1992)
> (drawing a distinction between packages addressed to the
> "alter ego" of a defendant, and those addressed to
> individuals other than the defendant). It is not clear
> whether Roland Martin was the alter ego of Villarreal or
> of Gonzales. Villarreal was in possession of the receipt
> for the drums that bore the name Roland Martin. Torres
> apparently indicated, however, that Gonzales had been
> identified to him as Roland Martin. In any event,
> Villarreal and Gonzales were both the immediate
> recipients of the drums, and they conspired together to
> get them from the SMT terminal in Corpus Christi. Under
> these circumstances, and given the ambiguity associated
> with the fictitious name, we find that both Villarreal
> and Gonzales had a legitimate expectation of privacy in
> the drums.

<u>Id.</u> at 774-75.

This court agrees that the mere use of a fictitious name for
the sender and/or recipient does not necessarily mean that an

24

individual does not have a reasonable expectation of privacy.  <u>See</u>
<u>United States v. Pitts</u>, 322 F.3d 449, 459 (5th Cir. 2003); <u>but see</u>
<u>United States v. DiMaggio</u>, 744 F. Supp. 43 (N.D.N.Y. 1990).[8]
However, <u>Villarreal</u> is factually distinguishable with regard to
Goldsmith.

In <u>Villarreal</u>, the Sixth Circuit implicitly reasoned that the
two defendants jointly possessed the marijuana at the time it was

---

[8]As the Fifth Circuit wrote in <u>Pitts</u>, 322 F.3d at 459,
"[t]here is nothing inherently wrong with a desire to remain
anonymous when sending or receiving a package, and thus the
expectation of privacy for a person using an alias in sending or
receiving mail is one that society is prepared to recognize as
reasonable."  The use of a fictitious name may often serve an a
legitimate interest in privacy.  For example, a celebrity may
check into a hotel under an assumed name to protect herself from
the insistent demands of adoring fans.  Similarly, a man might
order Viagra under a false name if his packages are delivered to
a common area of his apartment building.

    In <u>DiMaggio</u>, the court stated that the "expectation of
privacy vanishes [] when the identity of the sender and intended
recipient is not indicated on the package."  744 F. Supp. at 46.
However, the Supreme Court has held that a defendant had a Fourth
Amendment interest that was violated when law enforcement
officers, acting without a warrant, seized and watched films
depicting homosexual activity that were shipped by private
carrier to Leggs, Inc. even though: "There was no Leggs, Inc.
'Leggs' was the nickname of a woman employed by one of the
defendant's companies."  <u>Walter v. United States</u>, 447 U.S. 649,
652 n.1. (1980).  <u>DiMaggio</u> cites for its holding <u>United States v.</u>
<u>Givens</u>, 733 F.2d 339, 342 (4th Cir. 1984).  However, in <u>Givens</u>
the defendants were "claiming a privacy interest in the contents
of a package addressed neither to them nor to some entity, real
or fictitious, which [was] their alter ego, but to actual third
parties."  <u>Givens</u>, 733 F.2d at 341; <u>see also</u> <u>United States v.</u>
<u>Smith</u>, 39 F.3d 1143, 1144 (11th Cir. 1994) (defendant had no
Fourth Amendment interest in a package addressed to another, real
person); <u>United States v. Pierce</u>, 959 F.2d 1297, 1303 and n.11
(5th Cir. 1992) (same).

seized and that if only one actually possessed it, the other constructively possessed it. <u>Villarreal</u>, 963 F.2d at 773-74. <u>Id.</u> This is understandable as the defendants "were both the immediate recipients of the drums," and Villarreal and Gonzalez were together when the marijuana was picked up and when it was seized. <u>Id.</u>

Goldsmith, however, did not constructively or jointly possess the crate at the times it was seized and searched. In the First Circuit:

> "Possession" includes both actual and constructive possession. A person who has direct physical control of something on or around his/her person is then in actual possession of it. A person who is not in actual possession, but who has both the power and the intention to exercise control over something is in constructive possession of it.
>
> "Possession" [also] includes sole possession and joint possession. If one person alone has actual or constructive possession, possession is sole. If two or more persons share actual or constructive possession, possession is joint.

First Circuit Pattern Jury Instruction 4.22; <u>see also</u> <u>United States v. Akinola</u>, 985 F.2d 1105, 1109 (1st Cir. 1993); <u>United States v. O'Campo Guerin</u>, 968 F.2d 1406, 1409-10 (1st Cir. 1992); <u>United States v. Almonte</u>, 952 F.2d 20, 23-24. Unlike Villarreal and Gonzalez, Goldsmith and Gillies were not together when either the seizure or the search occurred. Goldsmith did not have direct physical control of the crate at either of those times. He has not proven that he then had the bill of lading, which might arguably have given him <u>de facto</u> control of the crate since Old Dominion

26

delivered it to Gillies upon presentation of the bill of lading even though the instrument was non-negotiable and delivery should have been made only to DVP Diving and Video. See Intech, Inc., 836 F.2d at 674. Thus, Goldsmith did not constructively possess the crate of marijuana at the relevant times. As Goldsmith did not have constructive possession of the crate, he did not jointly possess it with Gillies, even assuming, without finding, that Gillies possessed the crate when it was seized and when it was searched.

The conclusion that Goldsmith did not possess the crate at the relevant times is not qualified by the fact that there is ample evidence to prove that Goldsmith was then conspiring with Gillies to possess the marijuana with intent to distribute it. Defendants are liable for the foreseeable conduct of their coconspirators in furtherance of their conspiracy. See Pinkerton v. United States, 328 U.S. 640, 647 (1946); United States v. Barker Steel Co., Inc., 985 F.2d 1123, 1128-29 (1st Cir. 1993); United States v. Patriarca, 912 F. Supp. 596, 605 (D. Mass. 1995). However, the First Circuit definition of constructive possession requires the "power . . . to exercise control over something." First Circuit Pattern Jury Instruction 4.22. Coconspirators in a drug conspiracy may play decidedly different roles. See United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989). Not all coconspirators have the power to control the drugs at all times. Goldsmith has not proven that he had the power, directly or through Gillies, to

control the crate at the times it was seized and searched.

The Supreme Court has squarely rejected the claim that there is a "'coconspirator exception' to the rule regarding who may challenge the constitutionality of a search or seizure." United States v. Padilla, 508 U.S. 77, 78 (1993). In Padilla, the Ninth Circuit had held that "'[A] coconspirator's participation in an operation or arrangement that indicates joint control and supervision of the place searched establishes standing" to contest a search or seizure. Id. at 80. However, the Supreme Court reiterated that "[i]t has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if the defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." Id. at 81 (citing Alderman v. United States, 394 U.S. 165, 171-72 (1969)); Rakas, 439 U.S. at 131 n.1, 133-34; Rawlings, 448 U.S. at 106).

The Supreme Court noted that it had applied this principle in Alderman, 394 U.S. at 171-72, when it stated:

> "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing."

Padilla, 508 U.S. at 81-82. The Supreme Court concluded by holding that:

> Expectations of privacy and property interests govern the analysis of Fourth Amendment search and seizure claims. Participants in a criminal conspiracy may have such expectations or interests, but the conspiracy itself neither adds to nor detracts from them.

Id. at 82.

The First Circuit had previously rejected the "co-defendant 'derivative standing' doctrine." See United States v. Soule, 908 F.2d 1032, 1036-37 (1st Cir. 1990). It has, of course, continued to do so after Padilla. See United States v. Sepulveda, 15 F.3d 1161, 1194 (1st Cir. 1993).

In Rakas, the Supreme Court explained why the purposes of the exclusionary rule are properly served by not extending its possible protection to Goldsmith in this case:

> A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. Alderman, supra, 394 U.S., at 174. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, United States v. Calandra, 414 U.S. 338, 347, (1974) it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections. See Simmons v. United States, supra, 390 U.S. at 389. There is no reason to think that a party whose rights have been infringed will not, if evidence is used against him, have ample motivation to move to suppress it. Alderman, supra, 394 U.S. 174. Even if such a person is not a defendant in the action, he may be able to recover damages for the violation of his Fourth Amendment rights, see Monroe v. Pape, 365 U.S. 167 (1961), or seek redress under state law for invasion of privacy or trespass.

Rakas, 439 U.S. at 134. In this case, Gillies may have had the Fourth Amendment interest necessary to challenge the seizure and

29

search, but abandoned his effort to do so by pleading guilty.

Goldsmith did not personally own, possess, or control the crate containing marijuana that was seized in Tennessee and searched in North Carolina. While he did have a subjective expectation that the contents of the crate would remain private until delivered to Gillies, the totality of the circumstances indicate that expectation was not objectively reasonable. By giving a fictitious name for the company and individual he listed on the bill of lading as the shipper, Goldsmith attempted to insulate himself from any possible claim that he was an owner of the marijuana or knew what was in the crate. Providing his true driver's license was consistent with this effort, as it was compatible with a claim that he was a mere deliverer of the crate. If U.P.S. had delivered the crate to Old Dominion, it may have had a legitimate interest in the privacy of the contents while it possessed or controlled the crate, but not after. See Rakas, 439 U.S. at 149. This is, at most, also the maximum extent of Goldsmith's reasonable expectation of privacy. Therefore, he may not contest the seizure and search in this case.

IV.  ORDER

In view of the foregoing, it is hereby ORDERED that Goldsmith's Motion to suppress (Docket No. 96) is DENIED.

/s/ MARK L. WOLF
UNITED STATES DISTRICT JUDGE